IRMA LEIGH EARL

*v.*

BINNEY WOODWARD EARL.

[Decided April 19th, 1913.]

1. Upon the hearing of a wife's petition for an absolute divorce from her husband on the ground of adultery, and his cross-petition for like relief against her on the same ground, it appeared that both parties had gonorrhea, and the question was which of them had it first and communicated it to the other.—*Held*, that evidence of antenuptial incontinence of the husband is not admissible to support·the charge of adultery in the petition.

2. The fact that the petitioner remained with the defendant for some months after the discovery of the disease which, it is alleged, he communicated to her—*Held*, after a review of the evidence on this branch of the case, that her remaining there is not held to have worked such a condonation that would preclude her from securing a divorce under her petition.

3. The defendant's confessions are to be taken with extreme caution, and, without corroborating circumstances, might not be deemed sufficient to sustain the petitioner's case.

4. Upon a review of the whole case—*Held*, that there is no testimony to sustain the husband's cross-petition, and that the petitioner is entitled to a divorce, and in her behalf a decree *nisi* is directed.

5. Conversations had with a co-respondent in a divorce suit, in which he made certain statements relative to petitioner, are not admissible in the main issue, though they may be used to impeach co-respondent as a witness.

*Mr. John H. Backes,* for the petitioner.

*Mr. Joseph H. Gaskill* and *Mr. Reginald Branch,* for the defendant and cross-petitioner.

LEWIS, V. C.

This action is for divorce on the grounds of adultery. The petition of Irma Leigh Earl is for an absolute divorce. The petitioner charges the defendant, Binney Woodward Earl, with

communicating to her the secret disease of gonorrhea. The initial appearance of the defendant in this court was by answer denying the charges alleged in the petition. On April 30th, 1912, the defendant moved for and obtained leave to file a cross-petition, charging the petitioner with adultery, and naming Mark Whitfield, a servant in the household of the petitioner and defendant, as co-respondent.

It is shown by the evidence that both the petitioner and defendant had gonorrhea, and the question of course is, Which one had it first and communicated it to the other? The petitioner insists that the defendant communicated the disease to her, and, on the other hand, the defendant claims that the disease was given to him by his wife.

At the hearing of the case, testimony was admitted concerning the conduct of the defendant prior to his marriage. It was insisted by the petitioner's counsel that this testimony was admissible under the circumstances of the case, as showing the disposition of the defendant, and the court must confess to considerable sympathy with this view, when a divorce is sought for adultery, the charge being based upon the communication of a secret disease. There is no question, however, that under the authorities in New Jersey it must be excluded. Evidence of antenuptial incontinence is not admissible to support the charge of adultery in a bill for divorce. *Hedden* v. *Hedden, 21 N. J. Eq. (6 C. E. Gr.) 61.*

In a preliminary way it may be said that this marriage was that of a young girl of good family, in moderate circumstances, to a young man in affluent position. At the time of the marriage the defendant was twenty-two years of age, and the petitioner nineteen. It was a runaway match, and, as appears by the testimony, was objected to by the parents of the petitioner. The parties lived together until October, 1911, when the petitioner returned to the home of her mother.

Great stress is laid upon the fact that the petitioner remained with the defendant for some months after the discovery of the disease, which, it is alleged, he communicated to her; but it is shown by the testimony of the defendant that there was no cohabitation during this period, that the petitioner was not aware

of the character of the disease or its source; that she had been persuaded by the mother of the defendant and informed by the defendant himself that the disease had been contracted from a toilet. In treating of this phase of the case, it should be remembered that the petitioner, up to the time of her discovery of the secret disease, had lived in comfort and happiness with the defendant. The testimony shows that the attitude of the mother-in-law and of the husband, the defendant, from the time of the discovery, was extremely kind and considerate to her; that the petitioner had no means of support except that provided by her husband and his family and was dependent upon them. There is nothing developed in the testimony that proves to the satisfaction of the court that she was anything but an innocent young woman. No adulterous act on her part has been proven, and no evil associations have been shown. It was not unreasonable, under all these circumstances, for her to remain some time in the home of the defendant, even after the revelation of the secret disease, and her remaining there is not held to have worked such a condonation that would preclude her from securing a divorce under the petition filed.

The petitioner's case, in some measure, is dependent upon admissions made by the defendant to the petitioner's mother, Mary M. Leigh, and to her brothers, Dr. Chester Leigh and John Clinton Leigh. Aside from this, however, is the very important testimony of Dr. George D. Tracey, who attended both the petitioner and defendant. This is the only evidence offered by either petitioner or defendant from an outside source, *i. e.,* outside of the family, dealing with the time at which the petitioner and defendant were inoculated with the secret disease. This evidence seems to clearly establish the fact that Binney Woodward Earl first had this secret disease. Dr. Tracey first treated the defendant on July 5th, 1911. In the latter part of June or early part of July, 1911, the defendant first complained of a burning sensation when urinating. The first treatment given the defendant by Dr. Tracey was at the defendant's house, and for the first few days thereafter, he continued treating the defendant at the defendant's house. Later, the defendant went to the doctor's office for attention. The doctor went on his vacation on July 9th that

year. He remained away about two weeks or more, and upon his return, he treated Mrs. Earl. His testimony is, that he treated her after July 30th. While, upon cross-examination, Dr. Tracey stated that he might conclude from his examination of Mrs. Earl that she had been suffering from the disease for a period of eight weeks or more, yet, on redirect examination, he said that he was sure that her condition was not chronic, and that he could not tell whether it was of two weeks or four weeks or eight weeks standing.

Mary M. Leigh, the petitioner's mother, said that she had a conversation with the defendant in which she asked him why he tried to give Dr. Tracey the impression that he had contracted the disease from his wife, to which he replied that Irma did not give it to him; that he did not want Dr. Tracey or his mother to think so; that he knew he had given it to his wife. To Mrs. Leigh the defendant also said that his mother wanted him to say that he had contracted this disease from his wife, but he refused to say so because he knew that he had inoculated her. To the petitioner's brother John Clinton Leigh the defendant also said that his mother wanted him to say that he got the disease from his wife, but that this was not true; that he did not get it from her; that the fact was that he might have got it from a toilet. The defendant also had a conversation with Dr. Chester Leigh, another brother of the petitioner, two or three days after the visit by the petitioner to the specialist, Krusen, July 31st. To him the defendant said: "Chester, I have the gonorrhea. I know I gave it to your sister, but I do not know how I got it. Dr. Tracey told me that I might have gotten it from a toilet, but when he told me that, he laughed." It is shown throughout the testimony that the defendant frequently admitted to his wife, in the presence of her mother, that he had contracted the disease and communicated it to the petitioner.

A denial of these admissions is made by the defendant, and it is strongly urged by his counsel that the admissions of the defendant to the members of the family of the petitioner are not sufficient in law to sustain a decree. There is no doubt that the confessions of the defendant are to be taken with extreme caution, and, without corroborating circumstances, might not be

deemed sufficient to sustain petitioner's case. The cases of *Clutch* v. *Clutch,* *1 N. J. Eq. (Saxt.) 474;* *Miller* v. *Miller, 2 . N. J. Eq. (1 Gr. Ch.) 139,* and *Perkins* v. *Perkins, 59 N. J. Eq. (14 Dick.) 515,* are cited in support of this contention, but they are easily differentiated from this action. The evidence in the cases mentioned was, that the alleged offenders had made statements of wrong-doing. In *Clutch* v. *Clutch* the only direct evidence offered to sustain the charge of adultery was that of one witness who testifies that while the defendant lived in the home of his father-in-law he stated that he had the venereal disease. There was no strong corroborative circumstances shown in the cases referred to which would justify a decree. The case in hand differs materially from these. Here, the defendant, who suffered from a venereal disease, in his conversations with the members of the petitioner's family, declared that he had communicated the disease to her. The admission is established in this case, and the corroboration suggested by the cited cases furnished.

Citing the case of *Miller* v. *Miller, 20 N. J. Eq. (5 C. E. Gr.) 216,* defendant's counsel urges that the testimony of the mother and of the two brothers of the petitioner is of doubtful value, on the grounds that they had concealed the fact that the defendant made admissions to them. The facts were not kept from either the petitioner or the defendant, certainly not from the defendant, who made the admissions, and not from the petitioner, to whom the matter was made known, not only by the defendant but by the witnesses. The subject was generally discussed by the members of the petitioner's family and the petitioner.

The cross-petition charges the petitioner with infidelity with one Mark Whitfield, a servant in the household. Under the cross-petition, evidence was introduced to show undue familiarity on the part of the wife with one G., who is not named as a co-respondent in the cross-petition. G. was a visitor at the house, and it was clear that he had been a friend of the petitioner for many years, and that his invitation to visit the defendant's house was by and at the request of the defendant.

The defendant stated that his wife said to him, while G. was on his visit at their home, that she would like to kiss G., that she loved him. There was also a charge that she massaged his neck.

The petitioner testified that G. remained at the house of the defendant but one night, Saturday, and that he left before dinner the next day. She denies that she stated to her husband that she would like to kiss G., or that she loved him, or that she had massaged his neck. She says that G. had a sore neck and that she offered to fix some antiphlogistine for him to place upon it while he was at her house, but he declined. She denies that G. asked her to elope with him, or that her husband in any way reprimanded her for her conduct with him. For the purpose of strengthening the charge of familiarity with G., the defendant alleges that he took from the desk of the petitioner, after she had left his home, several letters from G. to her, containing expressions of endearment. He fails, however, to produce any of these letters, and says that he does not remember why he did not keep them. The petitioner denies any letters from G., save one thanking her for the hospitality he had enjoyed at the house, which letter she says she showed to her husband. There is not a scintilla of evidence which would form the basis of a charge of adultery with G., and, upon the testimony, I would exonerate the petitioner from the charge of any misconduct with him.

The co-respondent named in the cross-petition, Mark Whitfield, had been in the employ of the Earls almost since their marriage, and continued to be so employed until their separation in October, 1911, when he left of his own accord. The defendant says that one night, which he thinks was in the spring of 1911, upon returning home from Burlington with his chauffeur, Wright, he could not get into the house. He knocked on the side door and rang the front bell, a light was lighted inside the house, and through a small window in the front door, he and the chauffeur saw Whitfield coming downstairs. Whitfield had on an outing shirt and a pair of trousers and rubber-soled canvas shoes. The defendant says that after the door was opened by Whitfield, he went upstairs to his wife; that she had her hair down and was clothed only in a kimono, undershirt and pair of slippers; that he asked her what she had Whitfield upstairs for, and she replied, "Don't be unreasonable. I had him here because I was afraid to stay alone." On cross-examination he says that he and Wright did not get home until one o'clock, because the machine broke

down. They knocked at the side door first, and, upon getting no response, they went to the front door and rang the bell. When he first saw Whitfield through the glass opening in the door, he looked at one end of the side of the door leading from his wife's room. Whitfield took his time coming downstairs to let them in. He came directly from the place where the wife's room was. Defendant says he does not remember saying anything to Whitfield about his being upstairs, nor does he recall, upon entering the house, going to the dining-room and being there with the chauffeur and Whitfield, as Wright says they were. He swears positively that Whitfield came out of his wife's room and that he saw him coming out of her room. He says he did not ask Whitfield what he was doing in his wife's room, because he had absolute faith in his wife. He says he reprimanded his wife, but he did not go downstairs to chastise Whitfield, as he was not physically able. The testimony of the chauffeur, Wright, is that the defendant rang the front door bell, and that after awhile, Whitfield came from upstairs and opened the door and that they both went in. He says that when Whitfield started downstairs he could see him coming along, swinging around the corner of the door which led to Mrs. Earl's room. Mrs. Earl said, "Is that you, Binney?" and he said, "Yes." She said, "Where have you been?" He said, "I broke down and left the car at my mother's." She said, "I had to have Mark up here to keep me company, for I was afraid." On his cross-examination he says they walked to the Earl home from the trolley line of Edgewater Park and that they crossed the lawn to the side porch and walked around to the porch on the front; that the defendant knocked on the door loud enough for anyone to hear. He stopped at the side door before knocking about a minute, long enough for someone to come down and let them in, and that he rang the door bell, and in about a minute Mark came downstairs. The witness continues:

"I went on into the house. Binney and I stood close together. We were right close together, so that we both saw Mark come downstairs at the same time, through the opening in the door. Binney did not say anything to Mark, nor Mark to Binney. Mark closed the door. I went out into the kitchen. We went to the dining-room and then into the kitchen. I don't know whether Mark went out too. I went to the kitchen because Binney asked me to. I went there and stayed there a

little while, and then I went back. We were talking about the car with Mark Whitfield. I stayed in the kitchen about ten or fifteen minutes. Mr. Earl was there all the time with Mark. Mark let me out of the house that night."

The petitioner and Mark Whitfield deny that he was in the bedroom on the evening in question. The testimony of the architect who planned the house in which the Earls lived, proved, conclusively, that it would be impossible to stand at the front door of the house, peering through the glass door, and see a person coming out of the petitioner's room. This witness says that standing at the front door it would be impossible to see a door leading to any of the bedrooms in the house.

Wright, the chauffeur, testifies that he saw Whitfield wash napkins and towels, and that one day he spread out a suit of underwear that he thought was of female type. At the same time he saw some bloody water in the sink. This evidence is of small and doubtful value. Instances of Whitfield's presence in various bedrooms and bathrooms of the house are numerously related. The testimony clearly shows that Whitfield did general work in the house, cleaning rooms and making beds, besides performing his duty as cook. The chauffeur also testified that on one occasion, in the morning, about seven o'clock, he brought mail to the house; that it was a week before the separation; that the bell rang; that Whitfield did not respond promptly and that then Mrs. Earl called for him and the witness says that he recognized her voice; that it sounded as if it came from a front room of the house, but he could not say whether it was upstairs or down. The voice said, "Mark!" That Whitfield went into the dining-room in his pajamas. Wright says that Whitfield had an "erection on," and that the remark was made by him, "Here's where I get it off." That he returned in about fifteen minutes and there was no evidence of the erection. Wright, upon cross-examination, would not swear that he was positive that it was Mrs. Earl's voice that he heard calling. If this incident ever occurred, it does not require much stretch of the imagination to conclude that, if the voice was that of Mrs. Earl calling to Whitfield, what he meant by the expression, "Here's where I get it off," was that he was going to change his clothing before he put in an appearance be-

fore his mistress. The happenings upon the return home from Burlington, and the one just referred to, are the main ones suggested by the testimony under the cross-petition for asking a decree against the petitioner. It is true that the mother of the defendant testified that on or about the 10th day of June, 1912, the petitioner told her that she had great pain in urinating. Mrs. Earl, senior, remembers this date; she says, to quote her own statement, "Because that was a very happy day for me. I was building my house and I made my first payment on it that day." There are no receipts or other corroborative documents offered to show anything about this payment, nor is it said that the petitioner went into any detailed description of her sickness with the mother of the defendant. It appears also from the testimony that about this time Dr. Ephraim R. Mulford was treating the petitioner for hemorrhoids. On the 13th day of June of that year, Dr. Mulford made a physical, digital examination of the petitioner for this complaint, and he treated her for several days thereafter. Dr. Mulford, it is true, did not then examine the vulva. He said that the presence of hemorrhoids would account for the irritation of her bladder. If the testimony of the mother of the defendant is to be believed, as to this conversation with her daughter-in-law, the evidence of this physician may throw light upon petitioner's statement.

The testimony of one McCrea is offered to show that in February, 1911, Whitfield, the co-respondent, asked him if he knew where he could get some clap medicine. The testimony of this witness, on this point, and of Wright as to conversations with Whitfield concerning his conduct towards Mrs. Earl, were admitted, although it was urged by the petitioner that they were not admissible. The defendant offered them as impeaching the testimony of the co-respondent and as contradictory to his statements. The weight of authority is that such statements may be admitted, but not as bearing on the main charge and not as affirmative testimony against the petitioner. See *Graham* v. *Graham, 50 N. J. Eq. (5 Dick.) 701; Berckman* v. *Berckman, 16 N. J. Eq. (1 C. E. Gr.) 122.* The object of McCrea's evidence is obvious, but it might be just as reasonably inferred that Whit-

field, who was the servant of Earl, was purchasing or inquiring about the purchase of medicine for his employer.

Upon a review of the whole case, there is nothing offered which satisfies the court that the petitioner has been guilty of infidelity with Whitfield. If, for no other reason, I should not be inclined to place much faith in the testimony of the defendant as to alleged misconduct of his wife with Whitfield, on the ground that the latter was permitted by the defendant, who paid his wages, to remain in his employ at his home for months after the night that he alleges he came home and found him emerging from his wife's bedroom. To say the least, it was a most extraordinary course to pursue, for this defendant to retain in his service a man believed to have been guilty of criminal conduct with his wife. It is contrary to human nature.

It does not appear, from the testimony, that the petitioner was away from home at night without her husband or without his knowing exactly where she was, nor does it appear from the testimony that she was at home alone with Whitfield at night. The defendant himself says that he always took care to see that she was not left alone. There is no charge that she made secret trips with Whitfield or with any other man. It is significant that at or about the time that Earl contracted this venereal disease, he frequently stayed away from home all night. When away over night, he generally had his automobile with him, and yet he testifies that he stayed at his mother's house, which was only three miles from his own residence.

In passing, it may be remarked, that one of the suggestive features of this case is that when the defendant communicated with his counsel and filed his answer to the petition, he failed to advise them of the charges against petitioner contained in his cross-petition, which, as hereinbefore stated, was subsequently filed.

The conclusion of the court is that the petitioner is entitled to a divorce, and in her behalf a decree *nisi* is accordingly directed.