## ALMA C. CASHELL *v.* SAMUEL P. CASHELL.

*Adultery—As Ground for Divorce—Evidence.*

While adultery, as a ground for divorce, need only be proved by a clear preponderance of the evidence, to establish such a charge, the evidence should be clear, satisfactory, and convincing.                                                                                                                                       pp. 171, 172

In a suit for divorce on the ground of the wife's adultery, *held* that the evidence justified a decree for plaintiff. pp. 172-179

That the husband had at times suspected his wife of adultery was not ground on which to base a finding of condonation by him, in view of the fact that she had at such times been able to convince him of her innocence.                                                                     p. 179

*Decided June 8th, 1927.*

Appeal from the Circuit Court for Montgomery County, In Equity (PETER, J.).

Bill by Samuel P. Cashell against Alma C. Cashell. From a decree for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Kenneth Lyddane,* with whom was *Thomas F. Cullen* on the brief, for the appellant.

*Harold C. Smith* and *W. F. Prettyman,* with whom were *Talbot & Prettyman* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The parties to this appeal, Samuel P. Cashell and Alma C. Cashell, were married on the 17th day of October, 1906, at Rockville, Md. After their marriage they lived together

as man and wife upon the husband's farm in Montgomery County, Maryland, until their separation in 1926, at which time Samuel P. Cashell was forty-one years of age and his wife thirty-nine years.

On the fourth day of June, 1926, Samuel P. Cashell filed his bill in the Circuit Court for Montgomery County, in which he charged the defendant, Alma C. Cashell, with having committed the act of adultery with one John Weir, and in which he prayed that he might be divorced *a vinculo matrimonii* from said defendant because of the commission by her of said offense, and further, that he be awarded the custody of their three children, Hal, a daughter aged fifteen years, Gladys, a daughter aged eleven years, and Samuel Francis, a son, aged ten years.

The defendant in her answer denied the charge of adultery made against her, and testimony was taken in open court upon the issue presented by bill and answer. At its conclusion the court, on August 16th, 1926, passed its decree by which Samuel P. Cashell was divorced *a vinculo matrimonii* from the defendant, and the custody of the children awarded to him. From that decree this appeal has been taken.

The real and substantial question to be decided in this case is whether the charge of adultery against the wife was established by the evidence offered.

Although adultery is a crime under the laws of this state, it is not, when advanced as a ground of divorce, so treated in the sense that it must be proved beyond a reasonable doubt. To justify the finding of adultery in such cases, it is not necessary that the evidence shall be of the probative value required to convict a defendant charged with such crime. The offense need only be proved by a clear preponderance of evidence, but because of the great and lasting injury to the character of the person convicted of such offense, the court is charged with the "duty of examining and weighing with the most scrupulous care, the evidence adduced to support it, and, to establish such a charge, the

evidence should be clear, satisfactory and convincing." *Barnett v. Barnett,* 144 Md. 189; *Steele v. Steele,* 170 N. Y. Supp. 454.

It is with these established principles in mind that we will consider and weigh the facts of this case, to determine whether or not the charge of adultery was proved.

In the fall of 1922, the appellee and appellant, with their three children, were living upon the appellee's farm, and, so far as the record discloses, they were apparently satisfied with their surroundings and were fairly happy in their associations. The husband was engaged in his farming operations and the wife in her household duties, and both interested in the rearing and education of their children. It was while this condition existed that John Weir, aged thirty years, an Esthonian, who had been in this country only a short while, came into the community in which they lived. He was then paying attention to Miss Connell, the sister of the appellant, who at times was at the Cashell home, while nursing in the Montgomery County Hospital. Weir frequently called at the home of the Cashells and, on some of his visits there, he would take Miss Connell in his car to Washington and other places, and occasionally the appellant would accompany them. At times, when he would not find Miss Connell at her sister's, the appellant, upon his invitation and with the consent of her husband, would go with him to the hospital, while the husband remained at home with the children. As stated by the appellee, he thought she was enjoying herself, and as he trusted her, he was glad to have her go. It was not long before she ceased asking the appellee's permission to accompany Weir on these trips. After his visits, Weir would write the appellant thanking her for the hospitality shown him while at her home.

Thereafter, Weir ceased his attention to the sister, and became a frequent visitor at the home of the appellant, where he would often spend the week end, and upon these visits he would take the wife and children, or the wife alone,

riding in his car. His visits became more frequent and of greater length until, in January, 1925, he became a boarder at the Cashell home. While there he worked in Washington, twelve miles away, and when so employed, the appellant would frequently carry him to his work in the morning and go for him in the evening.

After becoming a boarder, he was almost constantly with the appellant and took her riding more frequently than before. At times the children would accompany them, though often they would be alone. On some of these trips they would go to Washington and there attend the moving picture shows, returning to the Cashell home late in the night. The evidence of a number of witnesses discloses that on occasions they would be out in the car so late as eleven and twelve o'clock in the night. The appellee testified that "they (Weir and the appellant) would get home early sometimes and sometimes it would be after twelve o'clock when they would come home, and lots of times they would not come in" at once on reaching home. The appellee had the utmost confidence in his wife, though at times he spoke to her concerning some of the things she did, which to him appeared indiscreet and imprudent, and on one or two occasions his suspicions were somewhat aroused, but she was always able to convince him that her conduct was proper, and that she had allowed no improper liberties to be taken with her by Weir, though she admitted to her husband that the corespondent had kissed her. The appellee, in his testimony, stated that the appellant and Weir would remain downstairs after he had retired, and this fact aroused his suspicions, so on one occasion he determined to watch them and, while in the room above, he looked through the register and saw them in the room below. He saw Weir pull a paper which the appellant was reading out of her hands. She reached out and he took her hand; he then handed the paper back to her, "got up, walked around and put his arm around her and laid his head against her face, and attempted to kiss her. He made several attempts and

in the meantime the colored woman called her about the chickens and they both went out to see what was the trouble." The appellee then went to the window and called the appellant upstairs and told her what he had seen. "She promised me that thereafter she would not be so familiar with Weir and would try to do what was right. I forgave her and told her it was quite a serious affair. I was willing to do anything and make any sacrifice to keep things together." Later in her association with Weir, she admitted that she loved him and that she would kiss those she loved; that she regarded him as a brother. The appellee further stated that, as their association continued, she became more fond of Weir, and more dissatisfied with the appellee himself; that she had no use for him, and wanted him to let her alone and make a living for the family, which was all that was required of him; that she had lost all affection for him. In October, 1925, she refused to allow him his marital rights, and thereafter persisted in such refusal up to a short time before the filing of the bill, notwithstanding they were living in the same home. Still it seems that the appellee was not convinced of any wrongdoing by his wife, and, as stated by the court below in his opinion, "he strenuously pressed upon her his desire for a resumption of their marital relations, but she repulsed his advances." After leaving the Cashell home, Weir went to board with a cousin of the appellant in Washington, where the appellant would occasionally spend the night. While there, Weir became ill with blood poisoning, and the appellant left her home and children and went to Washington to nurse him, where she remained with him ten days or more.

It was only about two weeks before the filing of the bill that the appellee obtained information that his wife had been unfaithful to him. He learned that one Walter Countee, a colored man who had formerly worked for him, knew of the unfaithfulness of his wife and through him he obtained the information.

Countee, while working for the appellee, lived in the home

of the appellee. He testified that the appellant and Weir would go out riding in the latter's car, sometimes in the day and sometimes at night; that he had known them to come in as late as eleven and eleven thirty o'clock at night. When asked if he had ever seen any particular act of familiarity or misconduct committed by them, he answered "Yes," and when asked to tell what he had seen, he said Mr. Cashell had a tenant house on his place and he used to go down to visit the occupants of that house, and "one night, I was down there and I came back and I seen this light coming in the front road, and I came on walking up the road, and I kept my car in the wagon shed and I walked on through the wagon shed by my car, and their car was about underneath two locust trees. Whose car? A. John Weir's. Q. Was it in that car they were in the habit of going out or not? A. Yes, sir; it was a Velie. So I came on up the path, and I heard something in the car. They had a little dog gave to the boy, and I thought it was the dog had got in this car, and I came along up by the path and was walking along there on the grass, and I heard a whining in the car, and I thought the puppy had got in the car, and I walked up there and I heard 'Um, Um, Um,' just like that; and I thought it was the dog; and I walked up to the car right easy and looked over in the car, and I seen Mrs. Cashell and John in the act; and I walked on away from the car and went on in the kitchen, and I walked on upstairs and sat on the side of the bed and waited until they came in, and I heard her whisper something to him, I don't know what it was." Upon cross-examination he was asked if he had told anybody what he had seen, and he said he told the cook the next morning, and she said "that's nothing." He was then asked, "Did you tell Mr. Cashell?" and he said "No, Q. When did you tell Mr. Cashell?" A. "Not until last spring (1926). Q. How did you happen to tell Mr. Cashell about it then? Because he came down the road and stopped me one day and asked me. I mentioned it to Mr. Shipe after I mentioned it to the cook." Upon being asked

whether it was an open or closed car, he said "It was an open car, but the curtains on the back were down" and when asked "Where were they in the car" he said "In the hind part. Q. On the floor or on the seat? A. On the seat."

Both the appellant and Weir when upon the stand denied that they had ever, on any occasion, committed the offense charged against them.

If the testimony of Countee can be believed, the charge against the wife is proven beyond any question.

The contention of the appellant is that Countee's·testimony is not worthy of belief, and that, without it, the evidence adduced in the case was not sufficient to establish the charge of adultery. In support of this contention, they rely largely upon the case of *Barnett v. Barnett, supra,* where the only evidence as to the charge against the defendant was that of two colored domestic servants. In that case this Court, speaking through Judge Offutt, said of that testimony: "It is not corroborated by any fact or circumstance proved by any other witness in the case, and it must therefore be measured by its own intrinsic probability. Except for what they said, the character of Mrs. Barnett for probity and chastity is unimpeached, since there is nothing else to show that she, at any time, by her conduct indicated that she had any undue affection for Maxwell (the co-respondent), or that she was ever upon intimate terms with him, or that she treated him with any more consideration than courtesy would naturally require her to show to her husband's guests. The Court also spoke of the contradictory statements of one of the witnesses when called upon by the plaintiff and defendant respectively. Later on in the opinion the Court again reverts to the fact that it was upon this testimony alone that the charge was to be sustained, if sustained at all, and said: "As we have stated, there is nothing in the record which tends to show any of those 'proximate familiarities' which so often in cases of this character illuminate obscure and doubtful facts and aid the courts dealing with them to give them their proper weight and significance. And in dealing with the evidence relating to such a charge, the facts relied upon to support it cannot

be considered separately, but should be taken together, since a fact which considered alone may appear innocent or incriminating, as the case may be, may have an entirely different significance when considered in connection with the other facts of the case. And an act which standing alone might be consistent with innocence, might have an entirely different aspect when viewed in the light of the known and established relations between the parties to it. As for instance where the conduct of the parties showing a disposition to commit the act of adultery concurs with an opportunity for its commission, the court will infer that it has been committed. 19 *C. J.* 139 ; *Fassett v. Fassett,* 143 Md. 35." And in that case, with the reasons so given, this Court refused to accept the testimony of the said witnesses as sufficient to sustain the charge of adultery made against the appellee.

The facts of that case, however, differ very widely from those of this case. The omission therein of certain facts, given as a reason for the non-acceptance of the evidence as sufficient to sustain the charge, is supplied in this case.

The co-respondent in the present case was not introduced into the home of the appellee and appellant as the guest of the former, though his visits were not opposed by the husband. On the contrary, the appellee, at first, at least, seemed pleased to have him, as he thought his presence there added to the innocent enjoyment of his wife. The appellee at times, when he thought his wife was imprudent in her acts and conduct with Weir, would speak to her concerning them, but she would convince him that there was nothing wrong in them, but, as their association continued, he observed that her treatment of Weir disclosed that she became more and more interested in him and less interested in the appellee, until she reached that point where she ceased to care anything at all for her husband and wanted nothing to do with him, saying that she had lost all affection for him, and with the increased interest and love for Weir, she, without cause shown, refused to permit the appellee to have those relations with her which he was entitled to as her husband. She became the constant companion of Weir, spending much of her time

with him alone, and when called upon by her husband to explain her acts of imprudence with him, he was told by her that it was none of his business, saying she loved Weir and she kissed those she loved, and she would kiss him.

From these and other facts stated, can it be said that she, who had not only withdrawn her affections from her husband and transferred them to Weir, but also had denied her husband his marital rights, did not have the disposition as well as the opportunity to commit adultery? See *Fassett v. Fassett,* 143 Md. 35.

Countee, after seeing what he said he saw, at once thereafter told the cook, another employee living in the home of the family, what he had seen. It is true, he did not tell Mr. Cashell his employer, who, so far as Countee knew, was then living unsuspectingly with his wife. The fact that he, a colored man, and servant of the appellee, did not venture to inform him of his wife's unfaithfulness, is not at all surprising or unusual. On the contrary, it was hardly expected of him, certainly not before he knew of a separation or breach between them. Had he been an intimate friend of the appellee and of equal social standing with him, he would then have been reluctant to mention to him what he had seen, indicating the infidelity of his wife, especially so long as they were living together on apparently friendly terms. The fact that he did not make such disclosure to the appellee until asked by him should not, we think, reflect upon the credibility of his testimony. What he had seen he not only told the cook, but later told Mr. Shipe, for whom he worked, at a time no doubt when the relations between Mrs. Cashell and Weir were being talked of in the community. When the breach came between the husband and wife, Shipe, no doubt, told Mr. Cashell what had been told him by Countee, and it was this information that caused the appellee to call upon Countee to learn from him what he knew. Moreover, in determining the credibility of Countee's testimony, consideration should be given to the fact that the learned chancellor below heard and saw Countee testify and was therefore in a better position than we are to adjudge whether or not Countee

was telling the truth; and in his opinion, referring to Coun-
tee, he said, "I was impressed with his straightforward,
honest manner and I believe he told the truth, notwithstand-
ing the defendant and co-respondent denied what he said."

It is also contended that, should it be held that the wife
was guilty of the charge of adultery, the husband has con-
doned the offense.  We cannot agree with the appellant in
this contention.  The husband placed great confidence and
trust in his wife and was loathe to think that she was guilty
of any wrongful conduct, though at times he could not resist
suspecting her, but, at such times, she was able to convince
him that she had done no criminal wrong.  This however,
was mere suspicion and not knowledge and, after acquiring
direct evidence of her guilt, he at no time thereafter made
requests of her to grant to him such marital rights.

From what we have said, the decree will be affirmed.

*Decree affirmed, the appellee to pay the costs.*