## SARAH F. KREMIS *v.* THOMAS KREMIS.
### [No. 53, April Term, 1932.]

224

*Decided June 22nd, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Samuel J. Aaron* and *G. Dudley Iverson, 4th,* with whom was *Howard L. Aaron* on the brief, for the appellant.

*Louis S. Ashman* and *Louis Azrael,* with whom was *Martin W. Seabolt* on the brief, for the appellee.

Offutt, J., delivered the opinion of the Court.

The parties to this appeal were married at Annapolis, Maryland, on November 5th, 1925, and lived, if not in harmony, at least together, until the spring of 1931. Kremis is an employee in a restaurant, and his wife is and for years has been employed as a cashier and bookkeeper at amusement resorts and cabarets.

When she married Kremis she owned and occupied property known as 1820 Clifton Avenue in the City of Baltimore, which in April, 1931, was placed in her name and that of her husband as tenants by the entireties. Following that, Kremis left the home in which they lived and on June 5th, 1931, filed the bill in this case against her in the Circuit Court of Baltimore City, in which he alleged that "on divers days and times in Baltimore, Maryland, in and about the month of April, 1931, the defendant committed acts of adultery with a man known as Jim Davis." The defendant, the appellant in this case, answered, denied the adultery, and alleged condonation. The case was tried in open court on those issues, and the trial resulted in a decree granting the complainant, the appellee here, an absolute divorce, and from that decree the defendant has appealed. The question in the case is whether that decree was justified by the evidence, and the answer to that question depends solely upon the credit to be given the witnesses respectively for the complainant and the defendant.

The specific facts relied upon by the complainant are that the defendant was frequently alone with the alleged paramour in his room in his mother's house, that she was on several occasions seen in an automobile with him late at night, and that on one occasion, while in a cab, they were guilty of improper and compromising conduct indicating an adulterous disposition. These facts the complainant and his witnesses affirm, while the defendant and her witnesses deny

that she was ever in the paramour's room, or that she was guilty of any conduct indicating an adulterous disposition, but admit that she had on occasions ridden with Davis in her own automobile, and she also alleged that since the supposed adulteries she cohabited with the complainant. These are the issues in the case.

Any detailed recital of the evidence relating to those issues, which is largely infiltrated with filth, rancor, and perjury, except to indicate the basis of the conclusion reached, is neither desirable nor necessary.

Kremis, whose name was originally Karentes, was formerly a motorman, but for the last four or five years has been employed at twenty-five dollars a week in a restaurant operated by his cousin James H. Memphos. His wife is employed at the "Jungle Nite Club" as a cashier, and her employment kept her there at times as late as two, three, or even four o'clock in the morning. Kremis is her third husband. She was divorced from her first husband, Harry M. Rathell, who is still living, and there is one child of that marriage, Jennie Rathell, who lives with her father. Her second husband is dead, and from his estate she received the property known as 1820 Clifton Avenue, in Baltimore. Some time after her marriage to him, Kremis went "in business" in Ellicott City, the defendant testified, on money which she furnished. She further said that to procure the money she mortgaged her home to Memphos, his cousin, who has since foreclosed the mortgage, and that she has lost her property.

Demetrios Soterokos, otherwise known as "Jim Davis," is a barber and lives with his mother in her home 2993 Harlem Avenue, in Baltimore. He first met Mrs. Kremis at a "Greek ball," at which he and Jennie Rathell, daughter of Mrs. Kremis, dancing together in a contest, won a cup, and at the time of the hearing he was engaged to marry her.

Jennie Rathell, the daughter of Mrs. Kremis by her first husband, at the time of the trial was twenty-one years old. She was married at fifteen, divorced from her husband on the ground of his adultery, and is employed in a "beauty shop" at Essex.

To prove his case, the complainant offered the testimony of Kaliope Goutos and John Goutos, her husband. They lived for about a year and a half in the home of Mrs. Soterokos, from whom they rented rooms, and were living there apparently until the summer of 1931. At the time they left, they were indebted to Mrs. Soterokos for unpaid rent, which she had been apparently unable to collect. John Goutos had known Kremis for about four years; his wife for but a short time. They both said unequivocally that Mrs. Kremis frequently visited Davis in his room in his mother's house, and remained there at times for as long as an hour, and that at times the door to the room would be closed while they occupied it. Philip Peters, also born in Greece, lived in the Soterokos house for about three weeks, and he too left because he failed to pay his rent. He testified that, during his stay there, "every day" Mrs. Kremis visited Davis' room, and that he would at times take her meals up to her. There was also the testimony of Louis Jonas, a taxicab driver, who said that he drove Davis and Mrs. Kremis from Carlin's Park to Davis' home one night, that they had been drinking, and were arguing, and that he had to help them into the house. Later, on cross-examination, he said that he saw them through the glass in the cab, in each other's arms, and, when asked if he had seen anything else, answered, "No, kiss one another."

The other cab driver said that they had, at Kremis' request, followed Mrs. Kremis and Davis while they were driving in a taxicab late at night, and it also appeared that on one occasion Davis or Mrs. Kremis, or both, were arrested while driving together in her automobile for some violation of the traffic laws. Kremis himself testified that when he accused his wife of intimacy with Davis she admitted that she had been guilty of perverted sexual practices with him.

On behalf of the defendant, Mrs. Kremis, Davis and Mrs. Soterokos stated positively that Mrs. Kremis was never in Mrs. Soterokos' home. Rathell testified that Kremis had offered him $150 if he would discover that Mrs. Kremis was guilty of adultery and would testify for him. Mrs. Kremis and one Wittenberg, her employer at the "Jungle Nite Club,"

testified that, on one of the occasions when Kremis charged that she was driving in a cab with Davis, it was he and not Davis who was with her, and that she was driving him at his request to meet a friend of his. Jennie Rathell testified that she had frequently been at Davis' home and in his room, but that her mother never had.

In reference to the issue of condonation, Kremis testified that on the night after he had seen his wife driving with Davis, and after she had confessed her adultery, he went to his room, and, when his wife came in at about four o'clock in the morning, she asked him if he were asleep, and, when he did not answer, she turned on the gas, and that he then dressed and left. Jennie Rathell and a friend, Betty Stokes, testified that on an occasion after that Kremis and his wife came to their home and that he spent some time with her in a closed room, and Mrs. Kremis testified that on that occasion they had marital relations. Kremis denied that he visited the house at all after he left.

It is apparent from this statement that the case turns not upon inferences from established facts, but upon the existence of disputed facts which permit but one inference. It is also impossible, with the utmost charity, to avoid the conclusion that certain of the witnesses for one side or the other as to Mrs. Kremis' presence in the Davis or Soterokos house have been guilty of deliberate and intentional perjury. It is also, because of the character of the witnesses and the nature of their testimony, impossible to say with certainty whose testimony is false and whose is true. Under such circumstances, much weight should properly be given to the conclusion of the able and experienced judge who presided at the trial. But that consideration, which ordinarily would be controlling, is to some extent, in such a case as this, neutralized by the fact that in reaching that conclusion the chancellor admitted and considered testimony which should have been excluded.

During the cross-examination of Mrs. Kremis she had been asked whether her first husband had not secured a divorce from her on the ground of adultery. An objection to that

question was overruled, and she replied that she did not "know what he got," that "she just went into the lawyer's office and signed the papers". Later still, on cross-examination, the complainant offered the proceedings, including the testimony in the divorce case, and, after objection, the court said:

"The court will allow in this allegation of the bill, which is the only ground alleged for divorce, the bill being signed by William M. Ballou, attorney for complainant, and the plaintiff being Harry M. Rathell, and the defendant being Sarah F. Rathell; the bill of complaint having been filed on the 22nd day of May, 1913, in the third paragraph thereof it alleges that the said defendant has been guilty of the crime of adultery with divers persons whose names are unknown to your orator and the said offense your orator has never condoned and prays for a divorce *a vinculo matrimonii*. Now then have you the decree? * * *

"(The Court) : I also note that there was a decree *pro confesso* taken in the case, on the 13th day of August, 1913, signed Henry D. Harlan, then sitting in the Circuit Court of Baltimore City, granting a divorce to Harry M. Rathell, and awarding the child to the care and custody of the maternal grandmother."

At the close of the case, Mrs. Kremis was recalled by the court and examined as follows: "Q. Mrs. Kremis, were you, in your younger days, an occupant of a house of prostitution at 642 Josephine Street? (The Witness) : Was I? No, sir. Q. That is the allegation made on the testimony of several witnesses in the former divorce case. A. I told you I did not know what I was signing when I signed. My husband came and told me he was going to take me to the ball game——Q. You did not sign anything, you did not appear. A. Yes, sir; I did; I went in and signed the papers. I signed something. (Mr. Aaron) : You signed an answer? (The Court) : She did not sign an answer. It was a decree *pro confesso*. (The Witness) : I went in and signed the papers. My husband was going with a girl and he got this girl in trouble and he wanted to marry this girl, and you can call him up and

ask him—— (The Court): The proof in the other case said that you were for months an inmate of a house of prostitution on Josephine Street, number 642. (The Witness): I can't help what they said, I was not. (The Court): Very good. (Mr. Iverson): If your Honor pleases, her former husband is here. (Mr. Ashman): He could not recall what it was based on. (The Court): I simply wanted to give her an opportunity of denying it. (The Witness): I certainly do deny it, Judge. (The Court): Very good."

Assuming, without deciding, that it was proper to ask Mrs. Kremis on cross-examination whether she had not been divorced from her first husband on the ground of her adultery, it was, in view of her answer, error to admit on cross-examination the proceedings and evidence in the former divorce case. She was charged in the bill of complaint with a specific adultery. The fact, if it was a fact, that she had on a former occasion years before been guilty of another adultery, while married to a man from whom she was later divorced, was not admissible to prove that she had committed the adultery charged in this case; nor was it permissible to adduce testimony given in an undefended case, by witnesses with whom she had never been confronted, to prove that she had been many years before an inmate of a house of ill fame. Even if evidence of that character was material or relevant to the issues in the case, it could not have been shown by a transcript of the testimony of witnesses given in another case, involving different issues, between the defendant and her then husband, especially in the absence of any showing that the witnesses were dead, incompetent, or inaccessible. *Jones on Ev.*, sec. 336 *et seq.* Apart from technical or formal objections, the record in the former divorce case was neither material nor relevant.

One of the most familiar rules of evidence is that it is not competent to prove one crime by proving another. *Jones on Evidence*, sec. 143. The exception to that rule is that apparently collateral facts may become relevant where they tend to show intent, motive, knowledge, system, or plan, and, on the issue of adultery, acts or familiarities between the same

parties other than those charged to show an adulterous disposition. The evidence under consideration fell within the general rule, but, according to what seems to be the weight of authority, was not within any exception thereto (*Bishop, Marriage & Divorce,* secs. 1400, 1401; *Keezer, Marriage & Divorce,* 251; *Houllon v. McGuirk,* 122 La. 359, 47 So. 681), and, while there is authority to the contrary, that conclusion is consistent with the principle universally recognized, that proof that accused was convicted of one crime should not be admitted merely for the purpose of showing that for that reason he probably committed that for which he is on trial. *Meno v. State,* 117 Md. 435, 83 A. 759; *Dobbs v. State,* 148 Md. 34, 129 A. 275; *Young v. State,* 152 Md. 89, 136 A. 46; *Callan v. State,* 156 Md. 459, 144 A. 350; *Wentz v. State,* 159 Md. 163, 164, 150 A. 278. In volume 27, *Ind. & Emp. Dig.,* secs. 2806-2808, cases are cited supporting the principle that antenuptial incontinence is not a relevant circumstance in support of a charge of adultery, unless the familiarities and misconduct were with the alleged paramour. The same principle is recognized in *Earl v. Earl,* 81 N. J. Eq. 444, 86 A. 940, and in cases collected in a note in 16 *Ann. Cas.* 1119. And *Mattison v. Mattison,* 203 N. Y. 79, 96 N. E. 359, while not precisely in point, does by analogy recognize it. In that case it was held improper to admit the final decree in a divorce proceeding in which the alleged paramour had been convicted of adultery with a person other than the defendant.

Nor was the evidence admissible to impeach the credibility of the witness, for "the character for veracity of a female witness cannot as a general rule, it is true, be impeached by evidence as to her character for chastity." *Brown v. State,* 72 Md. 475, 20 A. 186, 188; *Avery v. State,* 121 Md. 238, 88 A. 148; *Rau v. State,* 133 Md. 616, 105 A. 867; *Annarina v. Boland,* 136 Md. 380, 111 A. 84.

Excluding that evidence, the questions in the case are (1) whether the evidence remaining was sufficient to prove the defendant guilty of the adultery charged in the bill, and, if so, (2) to prove that the complainant condoned her offense.

In approaching those questions regard must be given to these considerations: (1) That the burden of proof is upon the complainant to establish the allegations of his bill (*Thiess v. Thiess,* 124 Md. 295, 92 A. 922; *German v. German,* 137 Md. 436, 112 A. 789; *Carter v. Carter,* 139 Md. 265, 114 A. 902; *Allen v. Allen,* 142 Md. 701, 121 A. 926), by evidence so clear, unequivocal, satisfactory, and convincing as to raise in an unprejudiced mind a natural and reasonable inference of guilt (*Totten v. Totten,* 150 Md. 701, 137 A. 916; *Cashell v. Cashell,* 153 Md. 171, 172, 137 A. 904; *Lang v. Lang,* 155 Md. 464, 142 A. 485; *Swoyer v. Swoyer,* 157 Md. 30, 145 A. 190; *Barnett v. Barnett,* 144 Md. 189, 125 A. 51); and (2) that the burden of proving condonation is upon the defendant. *Sterling v. Sterling,* 145 Md. 631, 125 A. 809. In applying the very severe test fixed by those rules to the evidence in a given case, consideration should be given to the habits, customs, and standards of those whose conduct is in question, for conventions of conduct necessarily vary with varying conditions of life, occupation, and habit. So that what might be in one case an almost certain indication of guilt in another might be consistent with innocence.

Returning to the immediate question, we are unable to accept the conclusion of the chancellor in this case. There is a slight preponderance in favor of the complainant on the issues of adultery both in the number and character of his witnesses, while on the issue of condonation the preponderance is in favor of the defendant.

Kaliope and John Goutos and Philip Peters said that the defendant visited Davis in his room; Jonas, a cab driver, testified that he left her and Davis at the Harlem Avenue house on one occasion and that they entered it, and that on another occasion he drove them to the 1600 block on John Street; it is not disputed that she was driving with Davis when they were arrested for a traffic violation; and Kremis, Tragors and Vitello, a cab driver, said that defendant and Davis were in an automobile together on the night Kremis left his home. On the other hand, the defendant Davis, the supposed paramour, and Mrs. Soterokos, his mother, all testified that Mrs.

Kremis was never in the Harlem Avenue house at all, and the only evidence as to an adulterous disposition is that of a cab driver, who testified that, while driving his cab through a city street at night, he saw Davis and defendant, who must have been in the rear of the cab, embracing, although he also said that on the same occasion they were intoxicated and "arguing". Their presence together on the occasion when they were arrested is explained by the daughter, who said that at the time she and Davis were in business at Essex, and that her mother drove Davis into Baltimore from her place of business; and she also said that she repeatedly drove with Davis and her mother. It also appeared that Davis gave an *alias* when applying for an automobile operator's license, and that Mrs. Kremis had signed an application for that license as his instructor. Jennie Rathell, Mrs. Kremis' daughter, testified, too, that she had frequently visited Davis in his room at the Harlem Avenue house. When considered in connection with the revolting and unnatural character of the alleged relationship of Davis with the mother of the woman whom he was engaged to marry, that evidence is neither satisfactory nor convincing. But even if it could be accepted as sufficient, it would avail the complainant nothing, if the proof was sufficient to show that he condoned the offense. As to that, Jennie Rathell, and a friend of hers, Betty Stokes, testified to facts which, taken in connection with the testimony of Mrs. Kremis, were sufficient to show condonation. That testimony was denied by Kremis, but as the record discloses nothing to support the conclusion that his testimony is entitled to greater weight than that of any of the three witnesses who testified against him, the fact of condonation was established by at least a preponderance of the evidence. It follows that his bill should have been dismissed.

*Decree reversed, and bill dismissed, with costs.*