## HOWARD M. JONES *v.* GERTRUDE JONES

[No. 37, April Term, 1938.]

*Decided May 25th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Richard H. Stevenson,* for the appellant.

*Isaac S. Gomborov,* with whom were *Joseph F. Di Domenico* and *Leon Abramson,* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal, Howard M. Jones and Gertrude Jones, formerly Gertrude Bursey, were married on October 2nd, 1930, and lived together in Baltimore until June 7th, 1937, when they separated, and since that time they have lived apart. On June 9th, 1937, Mrs. Jones filed the original bill in this case against her husband, praying the award of alimony and the custody of their infant child, then five years of age, on the ground of cruelty and desertion. The defendant answered, denied the cruelty, admitted the separation, but said that he would show that her conduct justified it. He also filed a cross bill in which he charged his wife with adultery with "divers and various men, whose names will be disclosed at the hearing of the case" and prayed a divorce *a vinculo matrimonii* and the custody of their child. She answered the cross-bill and denied the adultery. The case was tried upon those pleadings, and, after testimony and a hearing, the court dismissed both bills, awarded custody of the child to the mother, ordered the father to pay twelve dollars a week for its support, to pay a fee to his wife's counsel, and the costs of the case, but granted him the privilege of seeing the child at all reasonable times without restraint. From that decree the husband appealed.

Jones is a seafaring man. His trade is that of a marine engineer, his duties call him to far places, and require him to be away from his home much of his time. His earnings are substantial and according to his means he provided liberally for his wife and child. His marriage to the present Mrs. Jones was at least his second matrimonial venture. He had before his marriage to Gertrude Jones been married to Mrs. May Jones, who later appeared as a witness in this case against her successor. He met the second Mrs. Jones, then Mrs. Bursey, while she was living *par amours* with one Charles L. Wiley,

brother of the first Mrs. Jones. Notwithstanding her relations with Wiley, Jones married Mrs. Bursey and from that time until they separated he supported her and her children, they lived together except for occasional jars in comparative harmony, he was a generous provider, and she appears to have been a good wife and mother.

Mrs. Jones when she married her present husband was not without matrimonial experience either. She had been married to one Bursey, who disappeared leaving her with two children, one an infant twenty months old, to support. She was unable to support them, and when Wiley, who had married the absent Bursey's sister, offered to support her and her children if she would live with him, she accepted the offer. Eventually, because of his drunkenness, she left Wiley, and was not living with him when she married Jones.

On or about June 3rd, 1937, Jones and his wife had a violent quarrel. The cause of it is not clear. Jones said it grew out of his wife's familiarities with a man whom they met at a tavern where they had gone for food. She said that it was the culmination of bickering that had been going on for months. In the course of that quarrel Jones struck his wife in the face, she threw a lamp at him, and in the struggle his eye glasses and wrist watch were broken. A day or two later she swore out a warrant against him, he was arrested, tried, convicted and fined fifty dollars, and after that he did not return to his home. After the separation, in compliance with an order of court, Jones paid his wife fifteen dollars per week as alimony *pendente lite* out of his monthly salary of $285.

The only question which needs be considered is whether the appellant met the burden of proving the adultery charged in his cross-bill. Much of the argument in this court was predicated upon the hypothesis that condonation was an issue in the case. But condonation could not become an issue until the appellant submitted evidence sufficient to prove the charge of adultery, for until that was done there was nothing to condone.

The appellant in his brief does indeed state that "the adultery, in the opinion of the court, having been satisfactorily proven," the court dismissed the cross-bill because certain letters constituted condonation. But the court filed no opinion, and there is not the slightest intimation in the record that it determined that the proof was sufficient to support a finding that the appellee had committed adultery, and the decree itself is entirely consistent with a finding that she was not guilty of adultery.

The only witnesses called by the appellant to prove the charge (which the wife denied) were the appellant's divorced wife, May Jones, and her brother Charles L. Wiley.

May Jones, who testified on December 23rd, 1937, said that about two and a half or three years before that, while on her way to the "moving pictures," she saw a cab in which were Gertrude Jones and Wiley "pull up," and saw the woman and Wiley enter a house, and she then gave this testimony:—"I stood on the library lot and watched them. The light went on. A gentleman walked out. As he walked out I walked in and went to the second floor apartment. Q. Just a moment; before you went to the second floor apartment, did you see anything else? A. I took and removed my shoes and crept up the steps to the second floor apartment. There I saw Mrs. Jones disrobed and in bed with Mr. Wiley. I came down the steps, came outside, and waited for Mrs. Jones and Mr. Wiley to come out. When they did, I said, 'Mrs. Jones, what have you done now?' She said, 'Write to Howard and tell him, he is in Charleston, you can reach him, you tell him everything anyhow.'"

And on cross examination she testified: "Who had the second floor apartment? A. His name was Pine. Q. And you were there for what purpose? A. I was there to watch Mrs. Jones, because satisfaction was sweet. She broke my home up, and when I had an opportunity to see her do something I did. Q. You caught her, is that correct? A. Absolutely. Q. And you had in mind to watch Mrs. Jones? A. I had in mind, if I ever came

across her path where she was, I was going to see what was going on."

Notwithstanding her animus against Gertrude Jones, she said nothing of the supposed incident either to Jones or to any one else until Jones left his wife more than two years later.

The doubt inherent in her story because of the timely concurrence of so many fortuitous circumstances, considered in connection with her silence for so long a time, deprives it of any substantial probative force. Unless she and Wiley had agreed that he and the woman would be present at the time and place where the witness said she saw them, and she herself eliminated that possibility, it is so remarkable that she and they should arrive at the same time at the very place selected for the supposed assignation, that persons engaged in illicit clandestine intercourse should leave the entrance to the apartment in which they were so open and unguarded that she was able to actually observe their conduct, and that, at the very time when she wanted to enter the house, a convenient "gentleman" should walk out and leave the door open, that, unless corroborated by trustworthy testimony, her story merits little credence. And even more remarkable is the fact that while she was there to watch Mrs. Jones, who was certainly not likely to have given advance notice of her arrival, and that "satisfaction" was sweet to her, she said nothing for more than two years about the incident to the very person whom she wanted most to influence, her former husband and the present husband of Gertrude Jones.

The only corroboration of her statement is that afforded by Charles L. Wiley. Wiley is in no sense an exemplary character. While married to a sister of Bursey, a former husband of Gertrude, he was apparently living openly *par amours* with Gertrude. After she had left him because of his habits, and had married Jones, he apparently resented the implied reflection, and to quote from the testimony of Gertrude:—"He didn't like it a bit, and the time I saw him down the road, he

said, 'Are you sure you haven't made a mistake?' He said, 'Remember my doors are open to you and the children any time you and Howard bust up.' 1 said, 'You know, there's another little boy now. I had a boy by Howard.' He said, 'He is still welcome in my home and I will take care of him'." Wiley's sister, May Jones, was a former wife of Howard Jones, and when asked whether he was a friend of Jones he gave this testimony:—"Of course you never told Mr. Jones anything before he came out to see you? A. No, sir, I did not. Q. Were you and he always good friends. A. Well, now, what do you think about that? Q. I think you were pretty good friends, but you answer it just the same? (The Court) Answer the question, please. A. Well, I should say we were. When I seen him 1 spoke to him and he spoke to me, and we would stop and get talking. Q. When he was married to your sister, of course, you had known him for many years prior to that time, had you not? A. Why sure. Q. You had known, have known him for fifteen years? A. Oh, every bit of it. Q. And you and he have been friends? A. That's right."

He testified further that he had had improper relations with Gertrude Jones after her marriage to Howard Jones, but not after the occasion described by May Jones, but, except for that occasion, he failed to say when or where the supposed intercourse occurred. Jones, he testified, after he had separated from his wife, came to see the witness, and the witness quite freely informed him of his relations with Jones' wife after her marriage to Jones. The moral perversion implicit in the testimony of this witness, and in the uncontradicted testimony of his sister and Gertrude Jones, is such as to deprive it of any substantial weight or force. Courts of justice must, it is true, often secure the factual basis for their judgments from witnesses of doubtful character, but they are not required to accept as true the testimony of a witness who by his own testimony manifests such unconsciousness of the common decencies of ordinary life as to indicate a complete indifference to the force of any

moral obligation, unless strongly and clearly corroborated. Apart from any other consideration, therefore, we are unwilling to accept the testimony of these two witnesses as sufficient proof of the adultery charged in the cross-bill.

Moreover, the conduct of the husband after his alleged discovery of his wife's supposed misconduct is utterly inconsistent with a belief on his part that it ever occurred.

Beginning in August, 1937, and continuing for several months the parties corresponded with some frequency. In the entire correspondence no mention is made of Mrs. Jones' supposed adultery, although Jones had at that time all the information which May Jones or Wiley could give him. On the contrary the correspondence is what might naturally be expected between an affectionate and faithful wife and an affectionate and trusting husband.

On August 10th he wrote her:—"Hun I think of you and Bobby day and night. Oh if only things had been different. Hun you should never had me locked up. I don't think I will ever get over it. Hun it is too late now about that divorce. You started it, and here I am down here what can I do. If it does go through. We will get back together again, no matter what happens. I miss you so much. I am so lonesome and blue. I am on the verge of a breakdown. Well, Hun I must close now all my love to you and Bobby." In an undated letter he wrote: "How is my Boy—I hope O. K. Kiss him for me and some loving and kisses for yourself, if you want them? Hun I miss you and Bobby so much, why did you wait until I had to go away before you wanted to talk to me. We could have talked things over and everything would have been so different;" on August 12th, he wrote:— "Am feeling a little better now. I am up and around that is just about all. It is a shame I have to work so hard and worry so much. If it was not for you and Bobby I would take the first train back to Balto. * * * Well Hun I must close now. All my love to you and Bobby;" on August 17th, he wrote "Hun I think of you and Bobby

both, day and night. * * * Listen Hun what is it you said you could tell me a lot about Em and that crowd down there. You tell me all you know, and I will tell you something too. They are no friends of yours and I believe they had lots to do with things you did and was partly the cause of us being separated, and maybe the ones who put you up to having me arrested. Don't be afraid to tell me, I won't say a word about it;" on August 25th: "Pleas write to me down there, and let me know how everything is going. All my love to you and Bobby"; on September 14th: "I am writing this on my way down the river to Georgetown. We anchor off there tonight to wait for high tide to get out over the bar. I hope I can mail this there. Kiss my Baby for me. Must close now hun all my love and kisses to you and Bobby."; and on November 5th: "Hope you and Bobby are well." "Love to you and Bobby."

On July 27th, 1937, she wrote to him: "I wont always be down & kicked in the face Will I? Ill come back on top & then is my chance to laugh. Isnt it Hun Be good & please be careful & please write often & send a few pennies when you can. Ill appreciate them & so will Bobby. Don't work too hard & remember I still love you."; on August 5th: "I just heard a whistle honest hun it sounded just like the Betty. Those whistles do things to me hun. Well I guess thats enough to bore you with as will close with all my love and please write soon if only one line I look for it. There goes that whistle again."; and on August 12th: "I know I am not guilty & my maker above me knows I am not & that is all thats necessary. I love you sure I do every time I think of us I cry but you arent giving me a fair break by insisting on divorce. I didn't intend to divorce you you can ask anybody I only wanted alimony until you woke up thats all I am willing right now even though you are away to let everything be over & carry on just like nothing ever happened until you come home and never mention any of it again. But as I said before you can stop this divorce & if you dont Ill know then you didnt want to & that the beating you

gave me meant the end & you did it purposely. I really dont want a divorce. I want to live right thats all like other people do."

These expressions in Jones' letters are more consistent with the mental attitude of one who has procured evidence, which he knows to be worthless, of his wife's misconduct, than that of a husband who has secured credible evidence of her guilt. They were admissible primarily because they contradicted his statements that he had never forgiven his wife, and that before the separation he had suspected her of misconduct. Nevertheless, since they indicated that the appellant did not himself have any faith in the evidence which he offered to influence the judgment of the court, the court might very properly have regarded them as throwing suspicion on the credibility of his witnesses. He knew both witnesses, he had been married to one of them, May Jones, and he had known the other, her brother, for years, he knew, if any body knew, what their testimony was worth, and if he, believing it worthless, nevertheless offered it to prove his case, he cannot complain if the court took it at his valuation. *Fuller v. Fuller,* 41 N. J. Eq. 460, 5 A. 725, 727; *Moore on Facts,* secs. 145, 591.

Viewed as a whole, and without further discussion, it is sufficient to say that appellant's evidence offered to prove the wife's adultery fell far short of the measure established by such cases as *Barnett v. Barnett,* 144 Md. 184, 189, 125 A. 51; *Kremis v. Kremis,* 163 Md. 223, 232, 161 A. 255; *Cashell v. Cashell,* 153 Md. 170, 172, 137 A. 904; *German v. German,* 137 Md. 424, 436, 112 A. 789, and upon that evidence we are unwilling to disturb the decree of the trial court, which will accordingly be affirmed.

*Decree affirmed, with costs.*