# SUSIE BAUGHMAN GERMAN

*vs.*

# LEMUEL IRVING GERMAN.

*Divorce—Adultery—Burden of Proof—Evidence of Detectives.*

The burden of proof is on one asserting adultery as a ground for divorce.                                                p. 436

The testimony of private detectives as to circumstances tending to show adultery is entitled to no more weight than the testimony of the persons charged with the crime, all being interested witnesses, the former to justify their employment, and the latter to prove their innocence.                            p. 438

*Decided January 12th, 1921.*

Appeal from the Circuit Court of Baltimore City (STANTON, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Albert S. J. Owens,* for the appellant.

*John L. G. Lee,* for the appellee.

ADKINS, J., delivered the opinion of the court.

The parties to this suit were married in April, 1912. Beginning with their bridal trip and extending through six years down to the time of their separation in July, 1918, their quarrels were of frequent occurrence, mostly about matters of small importance and due to temperamental defects of both, to financial troubles requiring frequent moves, and to innumerable little things, which in themselves were of small importance.

The final break up came as the result of a breakfast table quarrel about what appears from the record to have been a trivial matter, ending in the use of language by the husband which the wife regarded as an insult, and in the throwing by her of a cup of coffee in his face. As the coffee was not hot, no physical harm was done but it seems to have been the last straw. He then and there announced "I am going to leave you now, I am never coming back again, the worm am turned." This was in July, 1918. He left her, never returned and never invited her to return to him; although there were subsequent interviews between them. He testified at the trial below that he meant the words above quoted when they were uttered, and "I mean them now," and that he did not intend to invite her to return.

The bill for divorce *a mensa* was filed by appellant August 8th, 1919, on the ground of abandonment and desertion. The defendant, on August 27th, 1919, answered denying the allegations of the bill. On September 5th the court passed an order for the payment of $20 per week as alimony *pendente lite*. A few days after the passing of this order, detectives were employed by the defendant, and on October 1st, 1919, a cross-bill was filed charging that the appellant "on divers days and times since the said marriage, to wit, on the seventeenth day of September, in the year 1919, and on the twenty-second day of September, in the year 1919, and at various other times has committed the crime of adultery with one E. Turner Duvall, and with divers other men whose names are to your orator unknown"; and praying for a divorce *a vinculo*.

On February 3rd, 1920, the answer to the cross-bill was filed denying the charge of adultery. Over three hundred pages of testimony were taken on the original bill, the greater part of which is unimportant, and nearly two hundred and fifty pages under the cross-bill.

Before taking up for consideration the testimony taken under the cross-bill, it may be well to say that we agree with

the conclusion of the trial judge that there was not such provocation as to justify the appellee in abandoning his wife; and that unless the charge of adultery has been proven against her, she is entitled to a decree in her favor under the original bill. And at the threshhold of the investigation of the facts sought to be proved by appellee, it should be said that nothing appears in the record tending to prove the charge of adultery except in connection with the alleged occurrences on the steamer "Florida" on the nights of September 11th, 17th and 21st.

As so much depends upon a careful weighing of all the evidence in cases of this character, the testimony in regard to these occurrences will be set out quite fully.

The important witnesses in this connection are the two detectives, Mrs. German, Duvall, and Mrs. German's niece, Elizabeth Whitehurst. The testimony of John T. Lyons, the manager of the detective agency, and of Frank O. Singer, as to statements alleged to have been made by Duvall, and the testimony of Mrs. Addie Young as to certain alleged statements by appellant will also be referred to.

Frederick Schilling testified that on September 11th, 1919, Mrs. German was in purser's office, about 6 o'clock, went to No. 97 about 7.30; stayed there until 8, when purser entered and remained about 15 minutes; then they both came out and went down stairs into the dining room; stayed there till 9.25 or 9.30; then both went upstairs and both went into the room and the purser stayed there 15 or 20 minutes. He then went to the purser's office. After that the engineer made several short visits to the room. Then about 12.15 the purser entered the room again. Witness in the meantime had not seen Mrs. German come out of stateroom. Witness remained outside until 3 or 3.30 in the morning and did not see him any more. Witness then retired. Witness was sitting on the main floor of the boat, and could observe the room plainly and could see the doorway, and could see the people walk in and out. At about 6.45 on the morning of

the 12th saw purser in his office. He proceeded to room 97, rapped on the door, held about 5 minutes conversation, did not enter, and returned to his office. Saw Mrs. German and the purser leave the boat in a taxi cab, about 9 o'clock; there were three people in the taxi; witness followed them in a taxi, but in the traffic in Granby street they got away. Next saw Mrs. German and the purser at 10 o'clock at the corner of Granby and Main Streets when they got off of a car together; they went into a shoe shining place, and visited five or six stores, one was a confectionery store, and another place they got ice cream or something. They proceeded around town until four or five o'clock in the afternoon, when the purser put Mrs. German on a car at the corner of Main and Granby Streets and left her.

On the 17th Mrs. German came back to Baltimore on the Florida. Mr. Wallace, another investigator from Smith, West & Lyons, was on board with Schilling. Mrs. German arrived on the boat at 5.30. She occupied Room 97. She went from there to the dining room with the purser and purser went in No. 97 at 11.35. Mrs. German was in the room. Wallace and Schilling watched until 4 or 4.15 when purser came out and went to his office. He had been in No. 97 continuously. Did not see Mrs. German come out.

Schilling and Wallace went to Norfolk again on September 20th, saw Mrs. German and Duvall (the purser) at Ocean View on the 21st. They came there together; they proceeded to rear of the bath houses, and sat down on the lawn; sat on the grass for about 1½ hours and then went to the car line and went to town. Next saw Mrs. German on the night of the 21st on the pier and on the Florida. A little girl was with her. They had rooms 95 and 97. The porter opened up both rooms. Both of them went in No. 97. Later on the child went in No. 95. Mrs. German retired around 9 or 10 o'clock. "She went into No. 97 and the child, I think, went into No. 95, I think." The purser "went in there around twelve, twelve fifteen to twelve twenty." He came out "about

four o'clock in the morning, something between four and four thirty." About 6.30, before the boat landed, the purser went to No. 97 and rapped at the door again. The lights went on in No. 97 at about 4 o'clock. Before that they were out. Witness could see the light through a sort of grating above the door. While Mrs. German was in the purser's office several other people were there coming and going. The door was open.

Robert W. Wallace testified that he was an investigator for Smith, West & Lyons; went to Norfolk September 14th; saw Mrs. German come on the Florida on September 17th; Mr. Rigney, the assistant purser, met her as she came up the gang-plank; she went on board and went to room 97; saw Mrs. German sitting in the purser's office early in the evening for about an hour. Mr. Duvall, Mr. Rigney and several other men were there at the time. Around 8 o'clock she went to room 97; and in about 15 minutes Mr. Duvall went up and rapped on the door; then Mrs. German and Duvall went to the dining room; they were there about an hour or an hour and a quarter. It was around 9.30 when they came out; Mrs. G. went to room 97, where Duvall left her at the door and went to his office. He remained in his office till about 11.30 when he came out and locked the door; then he went to room 97 (about 11.35) which he opened with a key and went in; had not seen Mrs. German after she entered her room after she came from the dining room; Duvall left No. 97 about 4.20—next saw her with Duvall at Ocean View on September 21st; witness and Schilling saw Mrs. German and Duvall coming towards the bath house at about 11:45 A. M., they did not go bathing; they sat on the lawn in front of the hotel; a little after 2 o'clock they took a car to go to Norfolk; at about 5.55 or 6 o'clock Mrs. German and a little girl boarded the boat; a porter opened rooms 97 and 95; the little girl is in court and says she is her niece. They went on the upper deck until the boat left Old Point Comfort. Then they went to Room 97, came out in a few minutes and

went to Mr. Duvall's office; later on they all went to the
dining room. They came out of the dining room about half-
past nine; after they came out of the dining room, Mrs.
German and the niece went to the upper deck; they remained
there about twenty or thirty minutes. Mr. Duvall went from
the dining room to his office. Mrs. German and the little
girl went to stateroom 97; witness and Schilling then took
up their watch on the doorway of room 97, Schilling going
to one end of the boat and witness to the other. "At 12.55 A.
M. on the morning of the 22nd, Mr. Duvall was observed to
go into room 97; he came out of there about 4.12 on the
morning of the 22nd, went down a flight of steps and went
towards the stern of the boat. The lights burned in No. 97"
for about ten minutes after Duval entered. Then for about
ten minutes before he came out at 4.12 the lights burned
again. They burned a little while after he came out, about
ten minutes. The lights were put out at 4.20 that morning."
Witness could tell whether or not the lights were burning in
the staterooms from the grating over the doorway.

It appears that the witness, Wallace, wrote out the reports
of Schilling's alleged observations on the 11th and 12th and
of what they both claim to have seen on the later dates and
had them typewritten.

On September 24th, 1919, Duvall was summoned to the
office of Lyons and the reports of the "investigators" were
read to him and Lyons remarked that it looked as if he
(Lyons) had him (Duvall) in a pretty bad fix. Lyons asked
him if he was willing for Mr. Frank O. Singer (the em-
ployer of Mr. German) to be called to the room, to which
Duvall assented. Singer repeated substantially the remark
of Lyons about Duvall having gotten into a pretty bad mess,
and, according to Singer's testimony, he advised Duvall to
see the counsel of Mr. & Mrs. German and try to have the
divorce suit compromised to avoid publicity. Duvall testi-
fies that Singer asked him if he knew he had made himself
liable to twenty years in the Atlanta penitentiary, which,

however, Singer denies.   Lyons does not positively deny that such a suggestion was made by Singer, but says he does not recall it.   Duvall says he signed the two papers with the understanding there was nothing in them of an incriminating nature, and that in reply to a question from Mr. Lee (before he signed the paper) he told him most emphatically he had no improper relations with Mrs. German.   This is not denied by Mr. Lee.   At any rate, Duvall was persuaded to sign two of the three reports, those of the 11th and 21st of September, and was induced to go to see Mrs. German on his next trip to Norfolk, where she then was, and to try to get her to come to Baltimore to confer in regard to a compromise.   This she refused to do, saying she would come to Baltimore and fight this thing out, that she was not going to let anyone call her a bad woman.

Duvall testified that the report as to the alleged occurrences of Sept. 17th was not shown or read to him at any time, and that the statements made by the witnesses Schilling and Wallace as to his being in Room 97 of the Florida on that night were absolutely false.

These reports, though offered in evidence by the defendant, do not appear in the record.   It does not appear, however, that there was any substantial difference between the statements contained therein and the testimony of Schilling and Wallace, except in the report of the 17th there is nothing said about Duvall having unlocked the door with a key when he entered No. 97 at 11.35 that night.

On the witness stand Duvall swears that he was in such a state of mind when the reports of the 11th and 21st were read to him, and he was told what a bad fix he was in, that he was willing to do anything to save his wife and Mrs. German from a scandal, and as most of the statements made in these two reports seemed to be true he signed them without reading them carefully; that he did not notice on the report of the 11th the length of time it was stated he remained in the room.   It is clear from the record he was

made to realize that appearances at least were against him, and was persuaded that by signing the reports of the detectives and inducing Mrs. German to compromise her suit for divorce he would prevent a scandal. Mr. Singer admits that his interest in the matter was to bring about a compromise for his friend and employe, the appellee.

The explanation given by both Duvall and Mrs. German of the visit of Duvall to her room the night of the 11th is as follows:

At about 12 o'clock she was taken very sick and rang the bell in her room and the porter answered. She asked for some paragoric. "He went down stairs and had not been gone long when some one knocked at the door. I asked who it was, and he asked: 'Is there anything wrong, Helen? Are you very sick? I said 'yes,' and I opened the door. There were two men lying apparently asleep on the floor, and he had to step across one of them to get to the door. I poured the paragoric out into a glass that I had in my room, and he stood there a few minutes at the door and we talked. I fixed the medicine and took it. I was dressed perfectly presentable to see a gentleman at my door. The door was open all the time; it was never closed." It all could not have been more than twenty minutes at the very outside. He took the bottle of medicine with him when he went away. Both of them swear positively as to the length of time Duvall was at or just inside the door. (Duvall says it could not have exceeded thirty minutes), and that the door was open all the time. Duvall said the two men asleep in front of the door were soldiers or sailors. It is to be noted that Schilling, the only "investigator" on the boat that night, did not say when testifying in chief that the door was ever closed and that he is not put on the stand to rebut the testimony of Mr. Duvall and Mrs. German on this point.

Mrs. Addie Young, a witness for Mr. German, testifies Mrs. German ate canned salmon at her house for supper at or about that time; that witness was made sick by it, and

that Mrs. German had told her she was sick that night on the boat."

Mrs. German and Duvall positively deny that Duvall was in her room at all on the night of the 17th.

It is worthy of notice that Schilling says nothing in his testimony about Duvall entering with a key; and from the statement in appellant's brief, not controverted by counsel for appellee, no such allegation appears in the original report made out by Wallace. His testimony on that point, therefore, seems to be an afterthought.

Mrs. German and her niece Elizabeth Whitehurst and Duvall testify as to Duvall's visit to room 97 on the night of September 21st. Elizabeth did not use No. 95 because her aunt was afraid for her to sleep in there alone with the window open. The window was left open because it was a very hot night. She was with her aunt all the time in room No. 97, while Duvall was there. He "came to the room about twelve o'clock (according to Elizabeth and Mrs. German) to fix a faucet in the bath room which Mrs. German had asked him to fix earlier in the evening. Mrs. German says: "We went to our room and it was a very hot night, we had the window and door open. We sat there, Elizabeth was embroidering, and I was doing my nails; as usual, the door was open. I pushed a chair against the door, and we sat there between the door and the window, until about twelve o'clock. I am sure it was quite that late. The man had not come to fix the faucet in the bath room, and Mr. Duvall stopped for a minute to fix it. We got to talking about this case, and wishing it would soon be settled. We went from one conversation to another, and sat there and talked until well after one o'clock. Then he went away. I judge it was about two o'clock when I said to Elizabeth, "that folks home have been in bed for a long time, I wonder what your mother would say if she knew that you were still up?" "Q. Where was your little niece all this time? A. She was sitting on

the bed right in front of me, I was teaching her a stitch that she was putting on a scarf."

Mrs. German also explained why she had two staterooms. She said one of them had been engaged for friends who did not come and had been paid for by them. The name of these friends was Young. They were connected with the moving picture business, and were in California when the testimony was taken.

Elizabeth Whitehurst testified as to the incident of the 21st. "Well, that night my aunt said the case was coming up in court the next day. I mean Tuesday, and we came up on Sunday night because we had to be in Mr. Owens' office all day Monday. That night we came up and had dinner with the officers on the boat and went to our room, and as we were going up the water was running in the bathtub very loudly, it was very annoying, and Aunt Helen said, 'won't you come up and fix it for us?' He said, 'Yes,' just as soon as he got through his work in the office. He came up later and I was sitting on the bed embroidering. She had one end of the scarf and I had the other, and he sat at the end on the little seat at the end of the bed, I sat on the bed and she sat in the chair, and they talked for about an hour I will say about an hour and fifteen minutes, or an hour and a half."

"Q. Were you awake all the time? A. Yes, I slept in 97 with Aunt Helen. Q. Your aunt slept in the same room? A. Yes, she was going to put me in 95. She went in and opened the window and the door, the bath room door (between the two rooms), but the hall door was never opened, but I stayed in her room, I did not like it there for one reason. Q. How did you happen to have two rooms? A. I heard her say she had friends coming up and we were looking for them, but they didn't come. Q. Do you have any idea what time Mr. Duvall came to the room that night? A. I said it was going on twelve o'clock. Q. The detectives say he stayed there until four o'clock in the morning, do you think

that is so? A. No, sir; because I awoke in the morning around about 3.30 or 4 o'clock, and I was looking out the window at the lights. Aunt Helen told me to go to bed and get some sleep because I had to be up all day the next day. Q. And you know that your aunt and this Mr. Duvall were not at any time alone together in that room? A. Never, I was either hanging at her arm or sitting at her feet, Mr. Owens, because when I am away from home, or in a strange place, I never like to be alone."

S. Turner Duvall's testimony as to this incident was as follows: "Q. I want to ask you whether you went to Mrs. German's room at 12.15 and stayed there until twelve minutes after four on that night? A. I do not remember what time it was, I went to the room after I had finished work. I walked up by the room then and I noticed a light and I asked her if she was up. She said, 'Yes.' I went in and talked to her and her niece. Her niece was in the room. I might have sat there and talked for an hour or two hours, I do not remember the time—three hours, it might have been. Q. Was the light lighted when you were there? A. Yes, as far as I can remember the light was lighted. Q. Were you and Mrs. German at any time alone in that room on that night? A. No, sir. Q. Then will you explain to the judge here, in the name of common sense, if you did certify to it, how you certified to the fact that you stayed there until four o'clock in the morning? A. Because I did not notice the time and I was just excited about the whole thing. I did not know just what I was doing, I guess. Q. Do you remember at the time you certified to that they said you were there until four o'clock in the morning? A. I do not remember the time they said I was there, no, sir. Q. What I want to know, as a matter of fact, during the whole time you were there, no matter how long it was, whether this little girl wasn't there with you? A. Yes, sir."

The testimony above referred to and quoted is all that it is necessary to give at length.

Mrs. Young said Mrs. German told her the day after the 21st that "about four o'clock in the morning she got very uneasy about the little girl being in there alone and she got up and went in and brought her in her room." Also that on one occasion she asked Mrs. German what Mr. Duvall's wife thought of her going with him and she said Mr. Duvall's wife was a perfect devil, that he could not live with her, and was going to leave her. All of this was positively denied by Mrs. German.

It is not inconceivable, as to the first incident, that Mrs. Young's recollection may be at fault as to just what Mrs. German told her. It seems hardly likely the aunt would have begun to get uneasy about the safety of the niece when the night was practically gone, or that she would have disturbed her at that hour of the morning.

Lyons testified that Duvall told him he would do anything to help Mrs. German out because he loved her. That he also said if she was willing he would marry her. How could he, having been married for a year to another woman? Singer also testified that Duvall said he loved her and he (Singer) asked him why he didn't marry her then; to which he replied, "unfortunately, I am a married man." Manifestly the statements of Lyons and Singer as to Duvall's alleged reference to marriage are inconsistent. Duvall denies positively that he made any of these statements about being in love with her. "I said I thought a very good deal of Mrs. German, liked her very much." He further testified that he was living with his wife, who was in the court room with him during the trial, and that he had no such feeling for Mrs. German.

When it is remembered that Duvall testified without contradiction that he had told Mr. Lee the very day and at the time he signed the reports that most emphatically there had been no improper relations between himself and Mrs. German, it is difficult to believe that he went out of his way to make a confession of the kind testified to by Lyons and

Singer. But if he did, Mrs. German cannot be bound by such a confession made out of her presence. Her prompt refusal to be scared into accepting a compromise in the divorce suit, notwithstanding the compromising position she was placed in by Duvall's signing the statements contained in two of the reports prepared by the detectives, does not indicate consciousness of guilt on her part.

The trip to Ocean View and another excursion to Virginia Beach are without incidents necessarily pointing to guilt when the relations existing between Duvall and Mrs. German's family, who lived at Norfolk and whom he was in the habit of visiting almost every time the steamer was in that port, are taken into consideration. The same may be said of the frequent calls over the telephone, the testimony tending to show that these conversations were in reference to Mrs. German's mother, who was dying with consumption, and between whom and other members of the famly at Norfolk and Mrs. German communication was had through Duvall.

Several incidents are related in the testimony, which, if true, show very indiscreet, immodest, and unbecoming conduct on the part of the appellant, but none of these seems to be in any way connected with the estrangement between the parties or to have caused appellee or their friends to suspect her of want of chastity. They appear to have become important only after the bringing of this suit. The three alleged incidents on the "Florida" are the only ones relied on as tending to prove adultery against the appellant. Before reverting to the testimony as to them it may aid in reaching a fair conclusion to recall certain well established principles of law and rules of evidence bearing upon cases of this character, although in such cases precedents can help but little, because each case depends so much not only on its own facts but on the dispositions and temperaments of the parties involved.

"The burden of proof is upon the complainant and the evidence must establish affirmatively that actual adultery was

committed; since nothing less than the carnal act itself can
lay the foundation of a divorce for adultery. Direct proof,
that is the evidence of eye-witnesses, is not required, for such
is the nature of the offense and the secret and clandestine
manner in which it is committed, that proof of this kind is
in most cases unattainable; yet where it is sought to be in-
ferred from circumstances, the latter must lead to the con-
clusion of guilt by fair inference, as a necessary conclusion."

The above paragraphs are quoted by JUDGE BRISCOE from
the *Kremclberg Case,* 52 Md. 553, in speaking for this Court
in *Thiess* v. *Thiess,* 124 Md. 292. JUDGE BRISCOE adds:
"All of the decisions declare, and the text writers hold, that
the presumption of innocence obtains in civil as well as in
criminal cases, where the issue involves a charge of moral
turpitude. Mr. Jones in his work on *Evidence* says: "When
fraud or criminal conduct is imputed, the decisions are to
the effect that something more than a mere preponderance
of evidence must be produced and that the proof must be
clear and satisfactory. And in this he is supported by
numerous decisions of this and other courts. *Conner* v.
*Groh,* 90 Md. 674; *Lalone* v. *U. S.,* 164 U. S. 255; *U. S.* v.
*American Tel. Co.,* 167 U. S. 224. It has been repeatedly
decided in this State that in cases of this kind courts will not
grant a divorce *a vinculo matrimonii* except upon clear, un-
equivical and convincing proof, and upon a state of facts that
satisfactorily establish the guilt of the defendant." Again:
"It is well settled that where the facts relied on to prove
adultery may as well import innocence as guilt, they must be
held to import innocence. The burden of proof rests upon
the plaintiff in cases of this character to establish the exist-
ence of the crime as charged. The proof must be clear, sat-
isfactory and convincing to overcome the presumption of in-
nocence and to establish adulterous intercourse between the
parties. *Jones on Evidence,* Sec. 195; 14 *Cyc.* 681 and 684,
and cases there cited."

Reverting now to the testimony—first as to the credibility of witnesses. We are unable to hold that the testimony of the private detectives, who call themselves "investigators," is entitled to any more weight than that of the appellant and Duvall, the alleged co-respondent, where they conflict. All are interested witnesses; the former to justify their employment by finding what they are employed to find, and the latter to prove their innocence. See *Wagoner v. Wagoner* (Md.), 10 Atl. Rep. 221; *Taft v. Taft*, 12 Am. & Eng. Anno. Cases, page 960, note; 19 *Corpus Juris*, page 142, Sec. 366, note 47.

With this standard as a starting point we find that the plaintiff in the cross-bill has not sustained the burden of proof cast upon him to prove guilt as to the occurrences of September 11th and 21st. Not only is the statement of the investigator Schilling, that Duvall entered the room of the appellant on the night of the 11th of September at about 12.15, and that witness remained outside until 3 or 3.30 in the morning and did not *see him come out,* not satisfactory proof that Duvall remained in the room until 3 or 3.30 o'clock (the witness being on the deck below the deck on which appellant's room was, and it not appearing that he was awake and watching closely all the time) but both appellant and Duvall swear positively that Duvall was at or just inside the door of the room for not exceeding twenty or thirty minutes; that the door of the stateroom was open all the time he was there; that Duvall came to the room after a porter had been rung up by appellant and sent to the purser's office to get some medicine for appellant, who was ill; and that there were two men asleep in front of the door all the time Duvall was there. Schilling was not called in rebuttal to deny that the door was never shut; that a porter had previously knocked at the door; or that two men were asleep in front of the door.

It appears from the record that Mrs. German had been travelling on these boats since she was a young girl; knew

all the officers well and was in the habit of taking supper at their table. Under these circumstances the occurrences noted by Schilling in the early part of the night have no special significance. Indeed that night is not mentioned in the cross-bill as one of the occasions when the crime charged was committed.

As to the occurrences on the night of September 21st, there were two "investigators" who testified for the plaintiff in the cross-bill, Schilling and Wallace. They swore that Duvall entered the room that night at about 12.55 and remained until about 4.12. Not only are they contradicted, as to the time that Duvall was in the room, by appellant and her niece (Duvall testifying that he took no notice of the time), but all three of them swear that the niece was in room 97 with her aunt all the time Duvall was there, and that nothing improper occurred. Mrs. German and her niece swear that Duvall came there before or about 12 o'clock and left before 2 o'clock; that they were talking about her case, which was then being, or about to be, tried in Baltimore, that being the cause of their being on the boat that night. So here again there is failure of proof. Besides it is inherently improbable that the offense charged was committed that night even if the niece occupied the communicating room and not the same room. The risk of discovery would have been too great.

This leaves only the night of the 17th. As to this there is an absolute conflict of testimony between the two investigators on the one side and appellant and Duvall on the other, the last two denying that there was any foundation whatsoever for the story of the investigators that Duvall was in appellant's room that night.

There is also inherent weakness in the testimony of the investigators, in that Schilling does not corroborate Wallace in the statement that Duvall unlocked the door from the outside with a key on this occasion; neither does this alleged fact appear in the written report made by Wallace.

It is significant that the report as to the occurrences on that night was not signed by Duvall and, apparently, was not presented to him at the time he signed the reports as to the other two nights in question; that, although professedly made up at the same time as, and fastened together with, the other reports, it is on different kind of paper and that these reports had been in possession of the appellee for sometime before they were produced in court. It is also significant that, although, if the testimony of the investigators be true as to the occurrences on the night of the 17th, they had complete proof of the guilt of appellant, it was thought necessary to continue the detective work and to make the trip of September 21st. If they reported to their employer the occurrences of the night of the 17th, that they swore to on the stand, it is difficult to believe that the third trip would have been thought necessary.

Taking all these circumstances into consideration, we are unable to say that the testimony of these two hired private detectives so far outweighs the testimony of the two other interested witnesses who contradict them as to prove the guilt of the appellant so clearly, satisfactorily and convincingly as "to overcome the presumption of innocence and to establish adulterous intercourse between the parties" accused. It follows that the decree below must be reversed.

> *Decree reversed and cross-bill dismissed; and cause remanded in order that a decree may be passed on the original bill in accordance with the views expressed in the opinion of this Court; costs to be paid by appellee.*