## KATHERINE ELIZABETH LANG *v.* GEORGE J. LANG.

[No. 45, April Term, 1928.]

*Decided June 21st, 1928.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Paul Johannsen,* with whom was *Mildred E. Johannsen* on the brief, for the appellant.

*J. Royall Tippett,* for the appellee.

Pattison, J., delivered the opinion of the Court.

George J. Lang, the appellee, filed his bill in the Circuit Court of Baltimore City, in which he alleged that his wife Katherine Elizabeth Lang, the appellant, had committed the offense of adultery with Peter Pohl, and asked therein for an absolute divorce from her. The wife answered the bill, denying the charge alleged against her, and thereafter, upon evidence taken before the court on the issue so joined, a decree was passed granting the relief sought by the bill. The sole question presented by this appeal is whether the charge of adultery made against the wife was established by the evidence produced in the case.

The parties had been married for more than twenty years at the time of the institution of the suit, and as a result of

that marriage they had one son, George, who was, at that time, nineteen years of age. The corespondent, Peter Pohl, first became known to the husband and wife five or six years before the divorce proceedings were instituted, through his employment by the appellee to paint his house. Thereafter, it seems, Pohl and Lang became intimate friends and Pohl frequently visited Lang's home, where he was often thrown in company with Lang's wife. As time went on, Pohl went frequently to Lang's house when the latter was not at home. The frequency of these visits led Lang to suspect his wife of improper relations with Pohl and, as a result thereof, he watched her movements in respect thereto. He stated that on one occasion, on leaving his home in the morning, he saw Pohl approaching and, to avoid him, Pohl ducked around the corner. Later Lang returned to his home and there found Pohl, and, as an excuse for being there, Pohl said he was looking for a coal oil can. On another occasion, upon returning to his home a little earlier than usual, he found his wife and Pohl in the cellar. On that occasion Pohl said he was there looking for a piece of wire. In March, 1927, he saw Pohl and his wife enter an automobile at Clinton and Pratt Streets, about eight-thirty o'clock in the evening. As they entered the car, he ran across the street and called to them, but they did not stop. Lang then went to his home, and later, about ten-thirty o'clock, his wife returned. The next day he said something to her about what he had seen the night before, and she called him a "liar."

Lang further testified that, on a Monday evening in May, 1927, he and Gustav Walters, his wife's brother, were in the vicinity of Calvert and Pleasant Streets, and saw his wife enter Pohl's car and drive off with him; that he, with Walters, in the latter's car, drove to Pohl's home and was there told by Mrs. Pohl that her husband had gone to the lodge and the building and loan association and was not at home. From there they drove to Pohl's shore place at Middleboro, which he said was about eight miles from the city. Upon arriving there he found the place dark, and, as said by him, "I walked around the house and I did not see any one, and I stayed

there at least an hour and three quarters, and Mr. Pohl then came out of the house and walked around the house and came down to his machine and went back in the house. They had a light lit then * * *. About twenty minutes time they came out * * *, Mrs. Lang wrapping up a little package of some kind, and she comes down and gets into the machine, and Mr. Pohl comes down and no more than he has started the car, I had a log of wood and I run in the back of the machine and jumped on the running board and hit him and the log broke, and Mr. Pohl hollered 'Oh!', and he had his car in reverse, and then I run across the field and pulled out a stake, these lot stakes, and he seen me doing that, and he turned his machine and goes over a field. From there I went home and I stopped in front of his house and he was just about ready to put his car away when we walked over, and my brother-in-law said, 'Mr. Pohl, what kind of a man are you?' He said, 'You shut up, have nothing to do with this,' and my brother-in-law walked around the cars towards him, and he runs in the garage and gets a shovel and I said 'Lay it down, you dirty dog, you are not worth hitting.' " Thereafter he and his brother-in-law went to his home about twelve o'clock and there saw his wife, and he expressed to her his surprise at her conduct above referred to, and she replied "Yes, I will go out with him again." He then said "Good night" and left that same week, and has never lived or cohabited with her since.

On cross-examination he was asked where his wife was when he returned to his home on the Monday evening or night mentioned, and his reply was, "Downstairs; still had her coat on. Q. What was she doing? A. She had a bottle of beer in her hand."

In corroboration of Lang's testimony, Walters, his brother-in-law, when called to the stand by the plaintiff, was asked, "Were you with Lang one night in May at the corner of Calvert and Pleasant streets? A. Well, your honor, I would like to ask a question before the attorney asks me that: Do I have to stand up for all statements that I made prior to—— (The Court): You don't have to stand up for anything. (The Witness): Then I wish to state that I don't know anything

about the case because I was drinking at the time. (The Court): You are sworn to tell the truth; you answer any questions that are asked you." He then proceeded with his testimony and in part corroborated the statements made by Lang, but he was unable to say that the woman he saw with Pohl at his shore place was his sister. He was able to recognize Pohl but not his sister. The woman, he said, "looked like my sister, built something like my sister." But when she came out of the house, which was not lighted, and "being all muffled up" he could not see her features. He was able to recognize Pohl, for when he first came out of the house, the house was lighted and he was enabled thereby to identify him.

Other witnesses testified as to the frequency of Pohl's visits to Lang's house in the absence of the latter.

Mrs. Lillian Stickler, a witness called by the plaintiff, testified that she on several occasions, in the year 1926, was asked by Mrs. Lang to go with her and Mr. Pohl after cherries or blackberries. She went with them four or five times, carrying her baby with her. On these occasions, Mr. Pohl would carry with him both whiskey and beer, also ice. That after reaching the cherry or blackberry grounds he would spread a blanket on the ground, put his beer and whiskey on the ice, and, when cool, they would sit there and drink it. On one or more of these occasions Mr. Pohl said to Mrs. Lang: "There are not many good cherries around here, let Lillian and the baby stay here and we go and get big cherries." This happened twice that she recalled. The witness was asked by the court: "Did you see any evidence of affection between them on any of these blackberry picking trips? A. Yes; kissed her and loved her. (The Court): What do you mean? A. Hugged her and kissed her? (The Court): In your presence? A. Yes."

Pohl, when upon the stand, admitted that he frequently went to Lang's home and at times Lang would not be at home; on some occasions to carry to them eggs and other things, which he brought from the farm, and on others to do work for them. He also admitted that twice he went with

Mrs. Lang and Mrs. Stickler to the country after cherries or blackberries, but both times he was asked by Mr. Lang to go with them. He admitted carrying "liquors" on those occasions, but he denied that he then, or at any other time, hugged or kissed Mrs. Lang, or that he then, or on any other occasion, had adulterous intercourse with Mrs. Lang.

Pohl further testified that on the evening or night when he was said to be at his shore with Mrs. Lang, he was at the Bohemian Building and Loan Association, of which he is a member, located on Chester Street and Ashland Avenue. Thereafter he went to Southwest Baltimore to fill a business engagement and from there returned to his home. After reaching his garage, which is opposite his home, he said: "I put my car in front of the door and opened the door and Mr. Lang and his brother-in-law pulled in front of my house and came after me, Lang with his hands in his pocket, and his brother-in-law was so drunk he could hardly stand on his feet and he started to mumble something to me * * * I told them to go home and sleep their drunks off. It was then exactly ten o'clock. I heard the chimes strike" and at ten fifteen o'clock he went to bed. He further testified that he was not at the shore with Mrs. Lang that evening or night, nor did he on that evening or night see Mrs. Lang, and that he was never at the shore place with Mrs. Lang alone.

In support of Pohl's statement that he was at the building and loan association on the night mentioned, Joseph F. Vicktor, an employee of the association, whose duty it was to receive the dues paid by its members, testified that Pohl on that evening, somewhere between eight and nine o'clock, was at the office of the association and paid to him his dues, as shown by the association's books.

Mrs. Lang, when asked about these blackberry trips, stated: "We were making wine and of a Sunday Mr. Lang would go places, but during the week Mr. Lang said it would be all right for me to go and it was he who suggested that I take these trips," which were made a year prior to the institution of these proceedings. Mrs. Lang further testified that she, on the evening in May spoken of by the plaintiff, left her

home at twenty minutes after seven and went to the Mercy Hospital to see a lady whose clothes she got every Monday to launder. She stayed there until about eight o'clock and then went to the Spiritualist's and there she found Miss Margaret Auer, who boarded with her, and later she returned with Miss Auer to her home, but before entering her house she talked a while with a lady on the corner. About a quarter of eleven Mr. Lang came home. He was at the time drunk and so was her brother, who came to the house with him. She testified that she had not on that night, or on any Monday night during the months of March, April, or May, seen Mr. Pohl. She denied that she was with him that night. Mrs. Lang, in her statement that she was at the Spiritualist's on the night in question, was supported by the evidence of Miss Margaret Auer, who testified that she was at the Spiritualist's on the evening mentioned, when Mrs. Lang came in, and remained there for some time, when she with Mrs. Lang returned to the Lang home about twenty minutes of ten. She went immediately into the house while Mrs. Lang remained on the outside. When Mrs. Lang came in she did not know, but it was not long thereafter. She said Mr. Lang came in later and he accused Mrs. Lang of being down on the shore with Mr. Pohl that evening or night.

As was said by this court in *Kremelberg v. Kremelberg*, 52 Md. 553:

"The burden of proof is upon the complainant, and the evidence must establish affirmatively that actual adultery was committed, since nothing less than the carnal act itself can lay the foundation of a divorce for adultery.

"Direct proof, that is, the evidence of eyewitnesses, is not required, for such is the nature of the offense and the secret and clandestine manner in which it is committed, that proof of this kind is in most cases unattainable; yet where it is sought to be inferred from circumstances, the latter must lead to the conclusion of guilt by fair inference, as a necessary conclusion. *Loveden v. Loveden*, 4 Eng. Ecc. 461.

"As to what facts shall, and what shall not, constitute proof of adultery, no general rule can be laid down, because the

same presumptions do not always follow the same facts, the weight of presumptions depending upon the character, habits and situation of the parties.

"The only general rule to be laid down on the subject, says Lord Stowell, 'Is that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion; for it is not to lead a harsh and intemperate judgment, moving upon appearances that are equally capable of two interpretations; neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the careful and cautious consideration of a discreet man. The rational and legal inferences from such facts must be the same.' "

See also *Loveden v. Loveden, supra; Thiess v. Thiess,* 124 Md. 292; *Pattison v. Pattison,* 132 Md. 367; *Bishop on Marriage and Divorce,* vol. 2, sec. 762.

"It has been repeatedly decided in this state that in cases of this kind courts will not grant a divorce *a vinculo matrimonii* except upon clear, unequivocal and convincing proof and upon a state of facts that satisfactorily established the guilt of the defendant." *Thiess v. Thiess, supra; Pattison v. Pattison, supra.*

Applying the principles stated in the above authorities and the standard fixed by them in determining the effect of the evidence, we are unable to find in the record proof sufficient to warrant a conclusion that the defendant was guilty of the offense alleged against her.

The evidence does not show, and the brief of counsel does not suggest, when and where the alleged adultery is claimed to have been committed; that is, whether at the time or times of Pohl's visits to plaintiff's home, when plaintiff was not there; upon the cherry and berry picking trips to the country; on the ride in Pohl's automobile on the occasion she is said by her husband to have entered the corespondent's car at the corner of Clinton and Pratt Streets, in March, 1927; or when at Pohl's shore resort in May of that year; or upon each and all of these occasions.

It is provided by article 34, section 4, of the Code, that "in suits, actions, bills or other proceedings, instituted in consequence of adultery or for the purpose of obtaining a divorce, * * * no verdict shall be permitted to be recovered, nor shall any judgment or decree be entered upon the testimony of the plaintiff alone; but in all such cases, testimony in corroboration of that of the plaintiff shall be necessary." The testimony of the plaintiff relative to the occasion when he saw his wife enter the automobile with Pohl, at the corner of Clinton and Pratt Streets, was wholly uncorroborated, and under the above statutory provision, it may be eliminated from further consideration. The same may be said of his testimony in relation to the visit of Pohl and the defendant to Pohl's shore place. Walters, who was called to the stand by the plaintiff, to corroborate the plaintiff's testimony as to that visit, before testifying told the court that he knew nothing about the case, as he was drinking at the time. And that he had been drinking, and was greatly intoxicated, was testified to by other witnesses. He was, however, directed to proceed with his testimony, and while he in part corroborated the plaintiff's testimony, he was unable to say that the woman at the shore or the one who was seen to enter Pohl's car on Calvert and Pleasant Streets was his sister. He first said that it was his sister who got in the car of Pohl at the place named, but later on, when asked by the court, "Are you sure that woman was your sister, Mrs. Lang?" he answered, "I would not take an oath on that." Because of Walters' condition of intoxication and his inability to testify that the woman with Pohl on that occasion was his sister, his testimony is without force or effect in the attempted corroboration of plaintiff's testimony.

As to the occasion when the defendant accompanied Pohl, Mrs. Stickler, and her baby to the country for cherries and berries, Mrs. Stickler testified that Pohl said to Mrs. Lang that the cherries where they then were, were not good cherries, and suggested that they leave Mrs. Stickler and the baby and go after larger ones. It is not shown where they went or how far it was from the place where they had

left Mrs. Stickler, or whether the place to which they went was secluded or concealed from public view. It may have been in a much exposed place, where the alleged offense could not have been committed without detection. If so, it certainly could not be inferred therefrom that their object in leaving Mrs. Stickler was for adulterous purposes, or that from such facts we are forced to the conclusion that she had committed adultery. If the evidence offered is capable of two interpretations, one of which is consistent with her innocence, that interpretation should be adopted and the decree not granted. 14 *Cyc.*, p. 94.

The other remaining occasion or occasions upon which it might be claimed the offense was committed was at the time or times when Pohl was at the home of Mrs. Lang in the absence of her husband. There is evidence to the effect that he frequently went to the home of the Langs and on some of these occasions Lang would not be at home, but upon this general statement, that Pohl visited the home in the absence of Lang, with no attending facts or circumstances, we are not warranted in holding that at such time or times the defendant was guilty of adultery with Pohl.

The conduct of the defendant with Pohl was extremely unbecoming and indiscreet, and was calculated to arouse the suspicion of the husband, but a divorce should not be granted upon that suspicion, unaccompanied by facts, which, by fair inference, must lead us to the necessary conclusion that the defendant had committed adultery. 9 *R. C. L.* In this case, in our opinion, such facts are not found, and we will reverse the decree appealed from divorcing the parties.

*Decree reversed, with costs.*