OSCAR ERVIN STEINLA *v.* IRENE STEINLA

[No. 46, April Term, 1940.]

368

*Decided May 23rd, 1940.*

The cause was argued before OFFUTT, PARKE, MITCHELL, SHEHAN, and DELAPLAINE, JJ.

*Edward J. Ryan* and *William H. Geppert,* for the appellant.

*F. Brooke Whiting* and *Morgan C. Harris,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Allegany County which divorced Irene Steinla, the appellee, absolutely from her husband, Oscar Ervin Steinla, the appellant, required him to pay her $100 a month as permanent alimony, and dismissed his cross-bill.

`The substantial question presented by the appeal is whether the evidence in the case justified that decree.

The ground alleged as a basis for the affirmative relief was appellant's adultery, and it may be said by way of preface that the evidence offered to support it, both as to quantity and quality, barely rises above an irreducible minimum.

Margaret Douglas, an "investigator," was employed in 1938 and 1939 by Mrs. Steinla, to observe and report upon the extramural activities and conduct of Oscar Ervin Steinla. The investigator observed and reported that she had seen Steinla on fourteen different occasions, accompanied by women other than his wife, on country roads, in automobiles, in restaurants, and in a building in which one of his female companions had an apartment.

More specifically, she testified, that on April 24th, 1939, she had seen Steinla call for a woman and drive off with her; that on April 27th, 1939, she had seen

him leave his garage at 11:10 P. M., drive to the corner of Washington and Greene Streets in Cumberland, where he "picked up" a "woman wearing glasses," that the witness and a male companion followed Steinla and the woman to Big Savage Mountain, where Steinla pulled over to the side of the road and parked, that witness and a companion drove by and returned a short time later, that when witness passed Steinla a second time she identified the woman with him as Frieda Layman, that they waited "on the hill in Frostburg," which was between Steinla's car and Cumberland, where he lived, until 1 o'clock A. M., but saw nothing of him, but were later informed by his wife that he did not return until 2:10 A. M.; that on June 10th, 1939, she saw Steinla and a friend of his, one Paul Sullivan, come out of Steinla's garage, get in a car and drive to Maryland Avenue, where "they picked up" the same woman and went with her to the "Dixie Inn" where they remained until at least 2 o'clock A. M., when witness left, that she then went back to Maryland Avenue, where she waited until 3:20 o'clock A. M. without seeing anything more of Steinla or his companion; that on June 13th, 1939, at "about 11:00 o'clock P. M. Mr. Freeland and myself followed the defendant and another man from his garage to Dixie Inn, where they joined Paul Sullivan, his girl, and Frieda Layman in a booth. The other man, who drove down with defendant, left about 11:50 o'clock P. M. Later Paul Sullivan, his girl, defendant, and Frieda Layman came out to the car. Defendant and Miss Layman stood in front of the car hugging and kissing. Defendant was singing 'Yes, Sir, She's My Baby.' They all got in the car and drove to Maryland Avenue, where they sat in front of the house for about ten minutes, and then Frieda Layman got out and went in the house. Then Mr. Sullivan took defendant home at 12:25 o'clock P. M.;" that on June 15th witness saw Steinla leave his garage at about 11:45 o'clock P. M. and later found him at the Dixie Inn with Sullivan, Frieda Layman, and another girl; that shortly after that Steinla, Sullivan,

and the two women drove off in the direction of Cumberland, and witness saw nothing more of him until Sullivan brought him home at about "1:00 P. M."

She testified that in 1938 she saw Steinla in the company of a Mrs. Byrd on a number of different occasions, that Mrs. Byrd lived in an apartment in a building at 131 Baltimore Street in Cumberland. The witness saw Steinla leave Mrs. Byrd at that building on February 28th, 1938; on March 5th she saw Mrs. Byrd get in Steinla's car in front of her apartment building and she saw them return at 3:20 o'clock A. M.; on March 6th she saw Steinla leave that building at 11:45 P. M. o'clock and walk in the direction of his home; on March 8th she saw him enter the building at 7 o'clock and leave at 8:30 P. M.; on March 9th she saw him enter the building and leave about an hour later; on March 12th, 1938, she saw Steinla's car stop opposite the building in which the woman had an apartment, saw her enter the car, later found her with Steinla in the Dixie Inn, saw Steinla and the woman return to that building at 3:20 o'clock A. M., saw Steinla and the woman enter the building, and although witness continued to watch it until 4 o'clock A. M. she saw no lights in the woman's apartment. Witness also testified that on March 17th, 1938, she saw Steinla enter the apartment building at 7:15 o'clock and leave at 9:40, that later in the same evening she saw him and the woman and two companions seated at a table at the Clary Club, and saw the four enter the apartment building at 2:50 o'clock P. M. and at 3 o'clock she saw three of them, Steinla and the two companions, drive away; on March 19th, 1938, she saw the same woman enter Steinla's car, later found them at the Dixie Inn, and saw Steinla leave the woman at her apartment building at about 3:15 o'clock A. M.

The testimony of the witness was corroborated by John McGuire who said that he was "engaged in this investigation" with Margaret Douglas, and that "the reports correctly state the facts which are related in them," and Mrs. Steinla testified that she had had no marital rela-

tions with Steinla since November, 1938, that he had recently treated her "very badly, and has been running around with women for twenty eight years," and that while she had not seen him running around with women she had "learned" of his committing adultery.

Jessie Herpich testified that on July 4th, 1939, when Mrs. Steinla was "out of town," she saw a woman come out of the Steinla residence with Steinla at about 11 o'clock in the morning and get in an automobile. Steinla testified that the woman with him on that occasion was his nephew's wife, but, except for that explanation, he failed to contradict or challenge any statement made by witnesses for the appellee, and the only other witness sworn on his behalf said only this: "The only time I have seen the defendant was when I followed him out with Mr. Freeland and he was with this other woman. I did not see him hugging and kissing Frieda Layman there, nor did I hear him singing, nor did I know who the defendant was with." But as she failed to identify the occasion to which she referred, her testimony is without significance.

It is apparent from this statement that for some time before this suit Steinla had been associating with women other than his wife under circumstances which justified a strong suspicion that his relations with them were immoral and improper, and, uncontradicted and unexplained, it cannot be said that the evidence is wholly insufficient to warrant a finding that he had been guilty of adultery.

In respect to the occurrences in 1938 it appears that Steinla was seen with the same woman entering or leaving the building in which she had an apartment on five different occasions, at times as late as four o'clock in the morning, but it does not appear that she was alone in the apartment when he was in the building, whether she was married and lived with her husband, whether she had a family, whether she lived alone in the apartment or whether she occupied it with others. It does appear, however, that on one occasion he called for the

woman at her apartment house at 6:45 o'clock in the evening and returned there with her at 3:20 o'clock the following morning.

While this testimony indicates that Steinla is a man of loose and dissolute habits, it is not sufficient to support a finding of adultery. A finding of adultery affects four persons, the State, the injured spouse, the adulterer, and the paramour. It directly and injuriously affects the paramour and the adulterer, and possibly indirectly affects children of the spouse and the adulterer. Because of the secret and clandestine nature of the offence, it is rarely shown by direct proof, but must of necessity in most cases be proved by circumstantial evidence. Because of the stigma which the finding carries, and the possibilities of error inherent in proof of that nature, the general rule is that the quality of evidence required to establish it must be high, and its quantum sufficient to satisfy a reasonable mind of the truth of the charge. It need not be proved beyond a reasonable doubt, except where it is the subject of a criminal prosecution, nevertheless, to justify such a finding, the evidence must be such as to exclude any reasonable possibility of innocence. *Hubbard v. Hubbard,* 127 Md. 617, 96 A. 860; *Pattison v. Pattison,* 132 Md. 362, 103 A. 977; *Fassett v. Fassett,* 143 Md. 35, 121 A. 859; *Cashell v. Cashell,* 153 Md. 170, 137 A. 904; *Lang v. Lang,* 155 Md. 464, 142 A. 485; *Resh v. Resh,* 156 Md. 699, 144 A. 361; *Marsiglia v. Marsiglia,* 162 Md. 700, 159 A. 914; *Campbell v. Campbell,* 174 Md. 229, 198 A. 414; *Carter v. Carter,* 139 Md. 265, 114 A. 902; *Pryor v. Pryor,* 146 Md. 683, 131 A. 47; *German v. German,* 137 Md. 424, 112 A. 789; *Barnett v. Barnett,* 144 Md. 184, 125 A. 51; *Sterling v. Sterling,* 145 Md. 631, 125 A. 809; *Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190; *Kremis v. Kremis,* 163 Md. 223, 161 A. 255; *McFrederick v. McFrederick,* 160 Md. 91, 152 A. 818; *Scrimger v. Scrimger,* 166 Md. 442, 171 A. 79; *Spellman v. Spellman,* 169 Md. 700, 182 A. 342; *Harward v. Harward,* 173 Md. 339, 196 A. 318; *Faulkner v. Faulkner,* 176 Md. 692, 4 A. 2nd 117. It must go beyond

proof of facts merely justifying suspicion, and show facts inconsistent with innocence. *Ibid; Lang v. Lang,* 155 Md. 464, 142 A. 485; *Marsiglia v. Marsiglia, supra; Stern v. Stern,* 173 Md. 689, 195 A. 565.

Where the finding must be predicated upon disposition and opportunity, since it affects two persons, the proof must show that the disposition was reciprocal and mutual. It is not enough to show that one only of the persons charged was disposed to the alleged adulterous act, or that one only was affected by a promiscuously adulterous disposition. Nelson, in his work on *Divorce,* sec. 165, says: "In reason it would seem that a lustful disposition might be proven by showing that defendant had been guilty of familiarities with other parties as well as with alleged paramour, as this would show a depraved character and a lustful disposition, and have great weight in connection with other circumstantial evidence." But he then goes on to show that whatever may be the merit of that principle, it finds little support in the cases, for the general rule is that proof of familiarities with one person is not in itself sufficient to prove adultery with another. *Ibid.* Bishop says: "Solicitations of other Women—are evidence to a husband's adulterous intent. Alone, they would not prove adultery actually committed, they would be even inadmissible, but they are of high importance when duly combined with other facts. * * * But whatever we would deem of this exact proposition, most will concede that a husband who has shown himself anxious to commit adultery with any woman, having cast to the winds his marriage vows, and having been denied by the woman he sought, is more liable to be the victim of one who is shown to be seeking him, and to whom he has turned with ample opportunities and snug occasion, than a husband whose heart is untravelled in wish or thought." *Bishop on Marriage, Divorce and Separation,* sec. 1375. But Bishop too cites strong authority against his position. The weakness of the position is that a finding of adultery stigmatizes two persons. That one of two persons charged with a joint offence

was disposed thereto should not be accepted as proof of the guilt of the other in the absence of some showing that the other was similarly disposed.

Applying these principles to the facts of this case, it cannot be said the evidence was enough to support a finding that Steinla committed adultery with Mrs. Byrd. There is no evidence of any impropriety in their conduct when they were seen together, nor any evidence that their relations were meretricious, unless that inference is to be drawn from the fact that he accompanied her to restaurants, and from time to time was seen driving with her, and entering or leaving the building in which she had an apartment at all hours of the day and night. They were never seen together in her apartment, it appeared that Steinla's employee had access to an apartment other than Byrd's in the same building, it did not appear that Mrs. Byrd was at any time alone in her apartment with Steinla, nor indeed is there any direct proof that he was ever in her apartment at all. While these facts justify a suspicion of guilt, they do not exclude a reasonable possibility of innocence, and cannot be accepted as sufficient ground for the conclusion that Steinla committed adultery with Mrs. Byrd. *Sterling v. Sterling, supra; Lang v. Lang, supra; Marsiglia v. Marsiglia, supra; Stern v. Stern, supra.*

On the other hand the evidence relating to Steinla's relations with Frieda Layman was direct and specific and established both disposition and opportunity. They were frequently together, on one occasion they were seen in front of a restaurant, where they had been together, "hugging and kissing," and again they were seen together in an automobile which was parked on a country road about midnight and on that night Steinla did not return to his home until after two o'clock in the morning. The fact that a married man and an unmarried woman were so indifferent to the proprieties as to engage in such a public exhibition of affection affords evidence of an adulterous disposition which, if uncontradicted and unexplained, may be accepted as sufficient proof thereof.

And the presence of the two, alone by themselves on a country road, at midnight may also be accepted as sufficient evidence of opportunity.

It is true that the evidence of those facts was furnished by paid private investigators, and as this court has had occasion to observe, evidence of that character is inherently doubtful, *German v. German, supra; McCleary v. McCleary,* 140 Md. 659, 118 A. 133. Yet since such witnesses are not incompetent (*McCleary v. McCleary, supra*), if not contradicted the evidence cannot be wholly rejected merely because the witnesses were hired detectives. 19 *C. J.* 142, 17 *Am. Jur.* 343. In this case the court is unwilling to disturb the finding of the chancellor that it was sufficient to prove the charge, mainly because neither the husband nor the alleged paramour nor any other person denied or explained in any way the statements made by the witness, her credibility was not attacked, and the chancellor had an opportunity denied to this court of observing the appearance and demeanor of the witnesses as they gave their testimony. The case of *Wendel v. Wendel,* 154 Md. 11, 139 A. 573, cited by the appellee in support of the decree, is in point, but the facts of that case were stronger than those stated here, and it cannot be accepted as controlling. Nevertheless the facts proved in this case do show the concurrence of disposition and opportunity, and this court is unwilling to set aside a finding based upon that evidence that appellant was guilty of adultery. No evidence of any kind was offered by appellant in support of his cross-bill, and it was properly dismissed. In view of the conclusion reached on the appeal it is unnecessary to consider the suggestion that the cross-bill should have been dismissed without prejudice.

The decree from which the appeal was taken will therefore be affirmed.

*Decree affirmed, with costs.*