## WARD WILLIAM STEVENS *v.* ALICE KISER STEVENS

[No. 153, October Term, 1945.]

*Decided June 13, 1946.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*John R. Reeves* for the appellant.

No brief and no appearance for the appellee.

HENDERSON, J., delivered the opinion of the Court.

The appellee filed her bill of complaint in the Circuit Court for Montgomery County, Maryland, against the appellant for a divorce *a vinculo matrimonii* on the ground of adultery, praying custody of their two infant children and alimony and counsel fees. The appellant answered, filed a cross-bill on the ground of adultery, and prayed custody of the children. Testimony was taken before one of the Standing Examiners and submitted to the court for opinion and decree. Thus, the court did not see the witnesses, although the parties had been before him on more than one occasion in preliminary proceedings. On December 14, 1945, after hearing argument, the court granted an absolute divorce to the appellee on the ground of adultery, dismissed the cross-bill,

awarded custody of the children to the appellee and fixed permanent alimony at $175 per month.

The first point raised by the appellant is an alleged failure to comply with Rule 36, of the General Equity Rules, in that the appellee was permitted to testify by reading from a prepared statement. But the transcript shows that, upon objection, the witness denied "reading from notes" and said: "I only referred to it as to time." We also find in the transcript a stipulation filed December 14, 1945, "between counsel for the plaintiff and defendant in this cause, that the various objections taken by each side in the course of the testimony in this cause will not be pressed and that the Court may consider the testimony without regard to said objections." Thus, even if the objection were well taken, it was clearly waived.

The main point pressed upon appeal is the lack of credible and substantial evidence to support the finding of adultery by the husband. A considerable part of the testimony produced on behalf of the appellee was from private investigators, who shadowed the appellant on four occasions, when he was with the alleged paramour. This Court has frequently had occasion to state that the testimony of investigators, who are interested witnesses, must be scrutinized with care. See *Bailey v. Bailey*, 186 Md. 76, 46 A. 2d 275, 279, and cases there cited. But it is a singular fact that in the instant case neither the appellant nor the co-respondent denied the testimony of the investigators; the only denial was as to what inferences should be drawn from that testimony.

At the time of the hearing the appellant was 36 years old, the appellee 30. They were married March 31, 1936. One child was born January 17, 1937, the other March 5, 1941, so that their ages were approximately 8 and 4.

The appellant was employed by the Foreign Economic Administration, an agency of the Federal Government, as Deputy Director of Field Operations Staff, with a base pay of $6,500 a year. He had a good opinion of his services, for he characterized his superior officer as

"nominal head. I actually supervise and run the operations." The co-respondent was "Administrative Assistant" in that Department. She was a married woman, 25 years of age, separated and living apart from her husband. When the appellant first asked her out to dinner, he testified, he told her "there was absolutely nothing sexual involved and I wanted it clearly understood." But on January 24, 1945, the investigators saw the appellant and the co-respondent in his car, parked in a closed gas station, hugging and kissing. They had dinner at a restaurant; later they were seen to enter her apartment. When the investigators left a half hour later, the appellant was still there. Neither the appellant nor the co-respondent denied these statements, except that they denied that he remained in the apartment more than a few minutes. They both state that the co-respondent's husband came to the apartment as Stevens was leaving. The husband testified that he called upon his wife one evening in January, and found Stevens there; he could not fix the date, or the time Stevens had been there before he arrived.

On January 31, 1945, Stevens took the co-respondent to a theatre. Afterwards they parked, and hugging and kissing ensued. The investigator lost the car when they drove off, and went immediately to her apartment. They had not returned an hour later. On February 5, 1945, Stevens and the co-respondent were again seen together in his parked car, hugging and kissing. On February 13, 1945, the same performance was repeated. This time the appellee accompanied the investigators and they saw the appellant and the co-respondent hugging and kissing, lost the car, and watched the apartment until 3 A. M. but the parties did not return. The apartment was dark and there was no response when they knocked at the door. When the appellee returned home at 3:30 A. M. her husband was there, "very agitated and nervous." She went downstairs and slept with her mother. On the following morning she examined the appellant's car,

"which he left at home because there wasn't any gas in it." She found the back seat cover torn loose and rumpled, hairpins on the floor, and the marks of muddy feet on the floor and sides. She also testified that the underdrawers the appellant had worn the previous night were torn in the crotch.

The appellee testified that she was then convinced that her husband had committed adultery; that she had become suspicious of his conduct and late hours in January, and borrowed two hundred dollars from her mother to hire detectives, but suspicion did not ripen into conviction until February 13th. After that date she never returned to her husband's bed, but slept with her mother until they left the house about a month later. This was verified by the mother. The appellee testified she had no marital relations with the appellant after January 11, 1945; the appellant admits there were no marital relations after February 12, 1945. We find no sufficient evidence of condonation in the appellee's conduct. See *Bowler v. Bowler*, 183 Md. 493, 502, 39 A. 2d 538, and cases cited.

On February 25, 1945, the appellee filed divorce proceedings. At that time she upbraided the appellant for his conduct. He admitted that he was infatuated with the co-respondent, but said: "If you won't mention the girl's name I will give you an uncontested divorce." He also said he would supply the names of women whom he had had intercourse with while away from home. He expressed concern that he and the co-respondent might lose their jobs. He denied, however, that he had committed adultery with the co-respondent, although he admitted hugging and kissing, and other intimacies. Both he and the co-respondent admitted in their testimony that they had hugged and kissed on at least four occasions, although they denied adultery. He stated that this was in order to "put on a scene" for anyone that might be following them. He suggested that instead of "slugging it out in court," the appellee and he should each confess

to a psychiatrist; in this way they might "make an adjustment" in their lives.

This is substantially all the testimony bearing upon the question of adultery. We need not recite the somewhat curious behavior of the appellant upon other occasions, such as his shooting of the neighbor's dog, his pretended suicide "to get some favorable reaction from Mrs. Stevens," his abduction of the children, his unconvincing efforts to throw doubt upon the paternity of his oldest child, and his encouragement of an abortion performed upon his wife on January 20, 1945. It was four nights later, and while marital relations were suspended on that account, that he admitted the deception of his wife and intimacies with the co-respondent. We may also note, without reciting in detail, the various statements of the appellant tending to show a morbid interest and sophistication in matters of sex, leading the trial court to remark that "Stevens, by his testimony, displays more than the usual sex-consciousness."

It may be true that the testimony in the instant case "barely rises above an irreducible minimum," as this Court said in *Steinla v. Steinla*, 178 Md. 367, 369, 13 A. 2d 534. Nevertheless, what was said in that case applies with equal force in the instant case (page 375 of 178 Md., page 537 of 13 A. 2d) : "The evidence relating to Steinla's relations with Frieda Layman was direct and specific and established both disposition and opportunity. They were frequently together, on one occasion they were seen in front of a restaurant, where they had been together 'hugging and kissing,' and again they were seen together in an automobile which was parked on a country road about midnight and on that night Steinla did not return to his home until after 2 o'clock in the morning. The fact that a married man and an unmarried woman were so indifferent to the proprieties as to engage in such a public exhibition of affection affords evidence of an adulterous disposition which, if uncontradicted and unexplained may be accepted as sufficient proof thereof. And the presence of the two, alone by themselves on a

country road, at midnight may also be accepted as sufficient evidence of opportunity." The decree of the lower court was affirmed.

The conduct of the appellant in the instant case was not consistent with innocence, as in *Bailey v. Bailey, supra*, or *Stern v. Stern*, 173 Md. 689, 195 A. 565, but falls in the pattern of *Steinla v. Steinla, supra*, and *Schriver v. Schriver*, 185 Md. 227, 44 A. 2d 479, 487. As was said in the latter case, "if a man and woman create the appearance of guilt when guilt does not exist, they have only themselves to thank." We think the appellee has met the burden of proof, under all the circumstances of the case, and that there is sufficient evidence of inclination and opportunity to carry conviction to a cautious mind. We find no error in the award of custody or the amount fixed as alimony.

*Decree affirmed, with costs.*