## BESSIE R. SCRIMGER *v.* WESTON B. SCRIMGER.

[No. 7, January Term, 1934.]

*Decided February 28th, 1934.*

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*H. Courtenay Jenifer* and *Albert A. Levin*, with whom were *Jenifer & Jenifer* on the brief, for the appellant.

*Daniel S. Sullivan*, with whom was *J. Fletcher H. Gorsuch, Jr.*, on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The appeal on this record is from a decree granting Weston B. Scrimger, plaintiff, an absolute divorce from Bessie R. Scrimger, defendant, on the ground of adultery, and awarding the custody and control of their six-year-old infant daughter to the father. The record is lengthy and the testimony recriminatory and concerned with a subject-matter whose vulgar details should be, as much as possible, denied the printed pages of the reports. The court will therefore confine its opinion within this limitation.

The defendant was divorced by her first husband. The plaintiff here was the co-respondent, and afterwards married

the defendant on July 21st, 1920, when he was twenty years of age and the defendant was twenty-seven years old. When the defendant and her first husband separated, her then husband took the older child, and the other child, a son, who was about one year old when the present litigants were married, was kept by the mother, and has lived with the plaintiff and defendant since their marriage. The business affairs of the husband prospered and the domestic situation was happy until June, 1925, when the husband was sent to Birmingham, Ala., as the superintendent of one of the stores of his employer. He left his wife in Baltimore, and she joined him six weeks later. The husband became suspicious of his wife's fidelity in Baltimore during his absence in Alabama, and directed an investigation, which resulted in the discovery of letters which revealed an adulterous relation. When confronted with these letters, she admitted she was the writer and confessed her infidelity. The husband forgave her on her promise to be true to him, and they resumed their marital relations. In September, 1925, the pair returned to Baltimore, and in February, 1927, their daughter was born.

The plaintiff was promoted until he became the general superintendent of the business house by which he is employed. He bought a desirable house, furnished it with all modern conveniences, and maintained his home in comfort. His position gave him supervision of 371 stores in Pennsylvania, Maryland, Delaware and New Jersey, and the performance of these duties required him to travel every week in this territory, which caused him to be away, on an average, two nights of every week. From September, 1925, until May 17th, 1932, the husband testified, his wife's conduct had been without fault, and that she had during this period given him no cause to doubt her marital fidelity. However, on May 17th, 1932, the defendant was summoned to Harrisburg to investigate a shortage of over $1,000 in the receipts of one of the stores. He could not postpone this trip. Before he left he had, in the afternoon, a telephone call from a person, whose identity was unknown to him, who gave him information that what had been done at the parties given by

his wife while he was away from the latter part of March, 1932, was the subject of neighborhood gossip, and stated that another party was to take place on Thursday night, and told him to see his sister-in-law. Although he had time, the plaintiff did not go to his home, nor did he see his wife, telephone to her, or send any message, but drove from Baltimore to Harrisburg in his automobile, arriving there about six o'clock in the evening. The husband testified that on his arrival in Harrisburg he immediately telephoned to his wife, and informed her that she should not have the party. His wife was surprised, and requested an explanation of her husband's demand, and was told that he had received information about the parties which, if correct, would mean that he would not live at home long.

The plaintiff had no further communication with his wife and remained in Harrisburg until Friday, when he left for Baltimore, arriving late that night, and did not go home, but spent the night with his father, although at that time he had heard nothing that affected his wife's chastity. The next morning he went to see his sister-in-law, Sadie Scrimger, wife of James O. Scrimger, and, on the statements she made, as he testified, of friendly and indiscreet, but not meretricious, conduct of his wife with Levin, he went to see Philip Levin, a tailor and presser of cloths, who lived in Halethorpe, which was where the plaintiff had his home. The plaintiff accused Levin of criminal intimacy with the defendant, and Levin denied the accusation, and informed the plaintiff the charge was false. Failing in his effort to obtain an admission of guilt from Levin, the husband went to his house and took away his clothes by climbing through a window. His wife had gone with the two children to visit her sister, Anna Irene Riesette, and so the plaintiff went there and walked into the basement and saw his wife and an older sister, Louise Howell, sitting there. Without speaking and without affording his wife an opportunity to explain or deny the injudicious but intrinsically harmless conduct attributed to her by her sister-in-law, according to the plaintiff's version of that interview, the husband went through the basement to see the two chil-

dren, who were playing in the alley. He returned, and his wife, disturbed by his demeanor, inquired what was the matter with him. He then repeated to her what he had been informed of her conduct in his absence, accused her of adultery, and falsely represented to her that her alleged paramour had confessed their guilt to him. The facts thus far are based on the evidence of the husband, and so far as they relate to the husband's conduct are uncontradicted. The husband further swore that his wife admitted infidelity with Levin; that he informed her he was leaving; that then she asked him if he would not go up stairs to the first floor and talk with her; and that he and his wife and the sister went to the parlor, where they were joined by another sister, Anna I. Riesette. The children came up, but the women sent them down stairs, and the defendant entreated her husband not to leave, and, in his words, "even went so far as to grab hold of my coat and pull me back, and I told her if she didn't leave go it would not be so well for her, and with that I left and slammed the door." He never saw his wife again until the day before he testified in the cause.

On his own testimony, the husband's conduct is inexplicable except upon the theory that he was eager for an opportunity to get rid of his older wife. He had heard nothing from Sadie Scrimger to justify an accusation of adultery, and the apparently indiscreet acts revealed by her were susceptible of explanations, which he gave his wife no chance to make.

To establish the charge of adultery, the plaintiff relies upon his testimony that his wife admitted her guilt to him in the presence of her sisters, Mrs. Riesette and Mrs. Howell. The wife and the sisters deny the admission was made. The husband offered testimony of his sister-in-law, Sadie Scrimger, that the defendant had made a statement to her to the effect that the defendant had had an assignation with the co-respondent. In this statement the sister-in-law is corroborated by her husband, but the wife testified that she did not make the admission, and she and the co-respondent testified that no such guilty meeting ever occurred. The other ma-

terial testimony offered by the plaintiff was that of John Myers and Oliver Thornton, who testified that the defendant had gone into her unlit bedroom with Philip Levin, the alleged co-respondent, late at night, on two different occasions, and had remained there about thirty minutes. Both of these occasions were after a party at which there had been eating, drinking, and dancing, and most of the guests had departed. The house was a one-story bungalow, with a living room and dining room which were separated by a wide hall from two bedrooms, with a bathroom between, and on the opposite side of the house. The bedroom fronting the living room was occupied by the plaintiff and defendant, and the two children were in the other bedroom. The guests had the use of all the rooms, which were easily in view. According to the evidence of Myers, who testified to both episodes, the first took place when the defendant and Levin left the company of Louise Howell, a married sister of the defendant and himself, while the four were in the living room together; and the second episode occurred in a similar manner, except that a third person, Oliver Thornton, was present and testified in corroboration of Myers. Adultery is usually clandestine, and the inherent improbability of testimony showing the commission of an act of adultery, practically in the view of her sister and another guest, the first time, and the sister and two other guests the second, is increased by the circumstance that it appears from the testimony that Myers was hostile to the defendant, and that Thornton's senses were stupefied by his excessive drinking. The defendant, the alleged paramour, and the married sister deny the wrongful implications of this testimony. The wife asserts her innocence of the offense alleged, and she is joined in this denial by the co-respondent. Their testimony is corroborated, not only by the sisters of the wife, but, in many of its details, by disinterested witnesses. On the other hand, the testimony for the plaintiff was marked by improbability and partiality, and discredited by circumstances and in conflict with the testimony of witnesses whose evidence displayed the qualities of credibility and probability.

The rule is that the proof of adultery must be clear, positive and satisfactory, so that it shall affirmatively convince the understanding of the fact that adultery was committed. It is not enough to show an adulterous reputation. Neither scandal nor suspicion will suffice. The facts in every case, as modified and affected by the particular circumstances, must determine the commission of adultery. *Wendel v. Wendel,* 154 Md. 24, 139 A. 573; *Thiess v. Thiess,* 124 Md. 297, 92 A. 922; *Carter v. Carter,* 139 Md. 265, 114 A. 902; *Kremis v. Kremis,* 163 Md. 232, 161 A. 255; *McCleary v. McCleary,* 140 Md. 661, 118 A. 133.

The evidence in this cause falling short of what is required of the plaintiff, his suit must fail.

*Decree reversed, with costs.*