HELEN C. VOGTS *v.* JAMES E. VOGTS, JR.

[No. 32, October Term, 1947.]

*Decided November 14, 1947.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*James H. Pugh* for the appellant.

*Charles W. Prettyman* and *William C. DeLacy* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

James E. Vogts, Jr., filed a bill of complaint in the Circuit Court for Montgomery County on July 15, 1946, charging his wife with adultery, and seeking custody

of their two minor children. A decree *pro confesso* was entered on September 26, 1946, and testimony was taken before an examiner. Thereafter, on October 11, 1946, the decree was stricken out, on petition, and the appellant filed an answer denying adultery and a cross-bill charging desertion and praying custody of the children. Testimony on her behalf was taken before the Examiner, and the whole transcript submitted to the chancellor. The appeal is from the decree granting a divorce *a vinculo* to the husband and awarding him custody of the children.

The parties to this cause were married on March 23, 1936, when he was 17 years of age, and she was 18. The parties did not live together as man and wife after the marriage for a period of more than five years. He attended school and college, and she resided at her parents' home with their child. He contributed nothing towards their support. She obtained employment in Washington.

On October 19, 1941, at the insistence of his parents, they purchased a house, subject to a mortgage, at Silver Spring and resided there together; a second child was born in 1942. They lived together until October 23, 1944, when he was inducted into military service. While he was away, the wife again obtained employment in Washington, first with the Dupont Company, and then in A-2 Intelligence of the Strategic Air Command, at a salary of some $2,400 a year. She also received an allotment from her husband. The appellee was discharged from military service on April 14, 1946, and came home. There was some discussion as to a divorce. Neither party appeared eager to resume marital relations, but in the end they resumed cohabitation, which was continued for about two weeks. He complained that she stayed out at nights. He employed a detective to procure evidence of her adultery. After working on the case for a week, the detective reported no progress and was dismissed. The husband found in the house some postcards addressed to his wife from a Colonel Gordon Austin. They were signed "Gordon" and contained noth-

ing of an incriminating nature except the statement "miss you." There were also pictures of Austin about the house. When he demanded an explanation, she told him she had met Austin and had been on parties with him; that she "liked him a lot," according to her statement, that she "was madly in love with him," according to his statement. The appellee testified (the appellant denied) that she admitted having committed adultery with Austin. After some further discussion about a divorce, he took his clothes and left the house on May 1, 1946, and went to live with his parents. A few weeks later she moved to her parents' house, with the children, and he returned to the house where he lived for a while and then rented it. Since the separation he claims that he has paid $300 toward the support of the children (she testified that he paid only $65).

The appellee produced three neighbors as witnesses. They testified that Mrs. Vogts often had noisy drinking parties in her house after her husband went in the army, and that Austin was frequently there. One of them testified that he saw Austin at the second story window in shorts one afternoon; that on one occasion Austin spent the night. Another testified that Austin's car was often outside overnight. The third neighbor testified that Mrs. Vogts told her she had gone to New York with Austin and had been introduced to his friends as his wife. They agreed that Mrs. Vogts like "a good time," and was an unsuitable person to have custody of the children.

Col. Gordon Austin, a full Colonel in the Air Corps, 33 years old, testified that he met Mrs. Vogts in March 1945 at the home of Colonel and Mrs. Dollenberg, and that, in company with the Dollenbergs, visited Mrs. Vogts at her home on several occasions. He denied that he ever spent the night at Mrs. Vogts' home, but admitted that he went there six or seven times for social gatherings. On one occasion he changed his clothes there, preliminary to going to the beach with Mrs. Vogts and other members of the party. He denied that he

was ever alone with Mrs. Vogts in the house. He went to New York with Mrs. Vogts to see the Army-Notre Dame football game that fall, accompanied by a Colonel and Mrs. Paul. The ladies stayed together at the hotel, and the men together. Col. Paul testified in corroboration of this statement, and denied any impropriety in connection with the trip. Col. Austin denied introducing Mrs. Vogts as his wife at any time, and denied any improper conduct with her. A Major Hearn testified that he had been to Mrs. Vogts' home on two occasions when Col. Austin was there, but never saw any demonstrations of affection between them.

Mrs. Katheryn Mann, an aunt of the appellant, testified that she often chaperoned parties at Mrs. Vogts' house, and frequently spent the night there. That she met Col. Austin there on occasion, but never saw the slightest impropriety in his conduct. She testified that the appellant was a devoted mother. Mrs. Vogts testified that Mrs. Mann was at the house every time Col. Austin came there, and that Col. Austin never spent the night there.

Patricia Vogts, the ten year old daughter of the parties, testified that she loved both her parents but wanted to stay with her mother. She testified that no man, except her father, ever stayed in the house overnight. There was evidence of the adequacy of the home surroundings in the household of the maternal grandmother.

We have reviewed the pertinent testimony in some detail. Its mere recital indicates upon what a slight basis the case of the appellee rests. Aside from the uncorroborated story of the wife's alleged confession (which she denies) and testimony of what the neighbors saw (which is denied or explained), we have no clear and convincing proof of either disposition or opportunity. Compare *Hockman v. Hockman,* 187 Md. 340, 50 A. 2d 136, and *Scrimger v. Scrimger,* 166 Md. 442, 171 A. 79. Indeed, from the husband's own testimony, it may be doubted whether he believed in his wife's guilt. After he had found the postcards and pictures and she had

told him (as he claimed) that she was "madly in love" with Austin, he testified that he suggested "she make a date with the man * * * maybe he would be willing to provide for her. * * * She continually nagged me about a divorce. Of course I had at that time no grounds for a divorce" and was "ignorant of just what I should do about getting a divorce. * * * I even suggested that we forget about what happened * * *. Of course during this time the investigation of these detectives was taking place, and I was hoping that he would get something upon which I would have grounds for a divorce." But he was disappointed in this hope. During the whole period, until he abruptly left the house, he continued to have marital relations.

If, in fact, the husband believed in his wife's guilt, there is strong evidence of condonation. *Proudfoot v. Proudfoot*, 154 Md. 585, 141 A. 395. Because of his unwarranted departure, the wife is entitled to a divorce *a mensa*, as prayed in the cross-bill. We also find that she is entitled to custody of the children. However, as the record is not clear as to the financial situation of the parties, we shall remand the case in order that the Chancellor may pass a decree fixing suitable alimony and support for the children.

> *Decree reversed and case remanded, with costs.*